UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

In re:

APOLLO HEALTH STREET, INC.

    Alleged Debtor and Respondent to Involuntary Petition.

Involuntary Chapter 7

Case No. 11-22970-NLW

## MOTION FOR ENTRY OR AN ORDER, PURSUANT TO 11 U.S.C. § 303, (I) DISMISSING INVOLUNTARY PETITION, (II) IMPOSING SANCTIONS, AND (III) DIRECTING  PETITIONING CREDITORS TO POST A BOND

RIKER DANZIG SCHERER HYLAND PERRETTI, LLP
Dennis J. O'Grady, Esq.
One Speedwell Avenue
Morristown, NJ 07962
(Telephone) 973.538.0800
(Facsimile) 973.538.1984

CADWALADER, WICKERSHAM & TAFT LLP
Deryck A. Palmer, Esq. (pro hac pending)
Andrew M. Troop, Esq. (pro hac pending)
Israel Dahan, Esq.
One World Financial Center
New York, NY 10281
(Telephone) 212.504.6000
(Facsimile) 212.504.6666

*Attorneys for Alleged Debtor*
*Apollo Health Street, Inc.*

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ........................................................................................ 1

JURISDICTION AND VENUE ..................................................................... 6

ARGUMENT ............................................................................................... 6

POINT I    THIS COURT SHOULD DISMISS THE PETITION PURSUANT TO 11
           U.S.C. § 303 .............................................................................. 7

           A.    There Is A Bona Fide Dispute As To Liability Or Amount With
                 Respect To Each Of The Purported Claims Asserted By The
                 Petitioning Creditors .......................................................... 8

                 1.    The Claims Of The Nudo, Morales And Colgan Are
                       Subject To A Bona Fide Dispute ................................... 9

                 2.    The Claim Of Med-Link Is Subject To A Bona Fide
                       Dispute .................................................................... 12

                 3.    The Claims Of 2 Broad Street Associates, LLC And 71
                       Washington Street Associates, LLC Are Subject To A
                       Bona Fide Dispute .................................................... 16

                 4.    The Claim Of Goldkhin Wholesale Enterprises, Inc. Is
                       Subject To A Bona Fide Dispute ................................. 19

                 5.    The Claim Of Senorita's Mexican Restaurant, LLC Is
                       Subject To A Bona Fide Dispute ................................. 20

                 6.    The Claim Of Merrel Mount Is Subject To A Bona Fide
                       Dispute .................................................................... 20

                 7.    The Claim Of Prominent Ticket Service Is Subject To A
                       Bona Fide Dispute .................................................... 20

           B.    Apollo Is Paying Its Debts As Those Debts Become Due ........ 22

POINT II   THIS COURT SHOULD IMPOSE SANCTIONS ON PETITIONERS
           PURSUANT TO 11 U.S.C. § 303(i) ................................................ 26

           A.    Apollo Is Entitled To Costs And Attorneys' Fees .................... 27

**PAGE**

    B.     Apollo Is Entitled To Compensatory And Punitive Damages ................... 28

POINT III    THE COURT SHOULD REQUIRE THE PETITIONING CREDITORS TO POST A BOND PURSUANT TO 11 U.S.C. § 303(e) .................................... 31

CONCLUSION ...................................................................................................................... 35

## TABLE OF AUTHORITIES

## CASES:

Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.,
    986 F.2d 709 (4th Cir. 1993) ...................................................29

B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.,
    865 F.2d 65 (3d Cir. 1989)................................................. 8-9

Bankers Trust Co. v. Nordbrock (In re Nordbrock),
    52 B.R. 370 (D. Neb. 1984), aff'd,
    772 F.2d 397 (8th Cir. 1985) ...............................................25

Fetner v. Haggerty,
    99 F.3d 1180 (D.C. Cir. 1996) .............................................32

Ieradi v. Mylan Labs., Inc.,
    230 F.3d 594 (3d Cir. 2000)................................................14

In re A & J Quality Diamonds, Inc.,
    377 B.R. 460 (Bankr. S.D.N.Y. 2007).....................................8

In re Cannon Exp. Corp.,
    280 B.R. 450 (Bankr. W.D. Ark. 2002)..................................29

In re Cinnamon Lake Corp.,
    48 B.R. 70 (Bankr. M.D. Fla. 1985) ......................................32

In re Elsub Corp.,
    66 B.R. 189 (Bankr. D.N.J. 1986) .................................... 28-29

In re Euro-Am. Lodging Corp.,
    357 B.R. 700 (Bankr. S.D.N.Y. 2007).....................................9

In re Express Car & Truck Rental, Inc.,
    440 B.R. 422 (Bank. E.D. Pa. 2010)............................. 22-23, 27

In re Grossinger,
    268 B.R. 386 (Bankr. S.D.N.Y. 2001).....................................29

In re Karber,
    25 B.R. 9 (Bankr. N.D. Tex. 1982).........................................25

In re Kidwell,
    158 B.R. 203, 218 (Bankr. E.D. Cal. 1993)..............................32

**PAGE(S)**

In re Lai Di Zhu,
    No. 10-19901PM, 2010 WL 4259553 (Bankr. D. Md. Oct. 21, 2010)....................................32

In re Landmark Distribs., Inc.,
    189 B.R. 290 (Bankr. D.N.J. 1995) ............................................................................. passim

In re Leek Corp.,
    52 B.R. 311 (Bankr. M.D. Fla. 1985) ....................................................................................22

In re McDonald Trucking Co.,
    76 B.R. 513 (Bankr. W.D. Pa. 1987) .......................................................................................6

In re Petro Fill, Inc.,
    144 B.R. 26 (Bankr. W.D. Pa. 1992) .....................................................................................25

In re R.N. Salem Corp.,
    29 B.R. 424 (S.D. Ohio 1983) .................................................................................................6

In re Regional Anesthesia Assocs. PC,
    360 B.R. 466 (Bankr. W.D. Pa. 2007) ....................................................................................9

In re Rimell,
    946 F.2d 1363 (8th Cir. 1991) .................................................................................................8

In re Rosenberg,
    414 B.R. 826 (Bankr. S.D. Fla. 2009) .....................................................................................9

In re Silverman,
    230 B.R. 46 (Bankr. D.N.J. 1998) ............................................................................... passim

In re Skyworks Ventures, Inc.,
    431 B.R. 573 (Bankr. D.N.J. 2010) ............................................................................ passim

In re Smith,
    243 B.R. 169 (Bankr. N.D. Ga. 1999) ...................................................................................29

In re Tama Mfg. Co.,
    436 B.R. 763 (Bankr. E.D. Pa. 2010) ................................................................................. 8-9

In re Tichy Elec. Co.,
    332 B.R. 364 (Bankr. N.D. Iowa 2005) .................................................................................29

Miles v. Okun (In re Miles),
    430 F.3d 1083 (9th Cir. 2005) ...............................................................................................32

Pursuit of Athletic Footwear, Inc. v. Save Power Ltd.,
    Civ. A. No. 96-40 MMS, 1996 WL 328596 (D. Del. June 7, 2006) .......................................14

PAGE(S)

Schmid v. Yorke (In re Reid),
    773 F.2d 945 (7th Cir. 1985) ...................................................................6

St. Louis Baptist Temple, Inc. v. FDIC,
    605 F.2d 1169 (10th Cir. 1979) ...........................................................14

Subway Equip. Leas. Corp. (In re Sims),
    994 F.2d 210 (5th Cir. 1993) ...................................................................8

United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,
    971 F.2d 244 (9th Cir. 1992) .................................................................14

**STATUTES & OTHER AUTHORITIES:**

11 U.S.C.:
    § 303, Hist. & Stat. Notes, Revision Notes & Legis. Reps., 1978 Acts ..................................43
    § 303(b)(1) ................................................................................7, 25
    § 303(e) .........................................................................................32
    § 303(h)(1) ...............................................................................7-8, 22
    § 303(i)(1) ......................................................................................26
    § 303(i)(2) ..................................................................................26-27

Fed. R. Bankr. P. 1011(b) ............................................................................7

Fed. R. Civ. P. 12(b) .................................................................................7

H.R. Rep. No. 109-31 (2005), reprinted in 2005 U.S.C.C.A.N. 88 .................................9

S. Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 ...............................32

2 Alan N. Resnik & Henry J. Sommer,
    Collier on Bankruptcy ¶ 303.31[2] (16th ed. 2010)..................................................22

By this motion, Apollo Health Street, Inc. ("Apollo" or the "Company"), the alleged debtor in the above-captioned involuntary Chapter 7 case, by its undersigned counsel, seeks an order, pursuant Rule 12 of the Federal Rules of Civil Procedure, made applicable by Rule 1011 of the Federal Rules of Bankruptcy Procedure, and pursuant to 11 U.S.C. § 303, (I) dismissing the involuntary petition (the "Petition") filed by Michael C. Nudo, Ariel J. Morales, William J. Colgan, Med-Link Computer Science, LLC, 2 Broad Street Associates, LLC, 71 Washington Street Associates, LLC, Goldkhin Wholesale Enterprises, Inc., Senorita's Mexican Restaurant, LLC, Merrel Mount, and Prominent Ticket Service (collectively, the "Petitioning Creditors"), (II) awarding costs, reasonable attorneys' fees and damages against the Petitioning Creditors, and (III) requiring Petitioning Creditors to post a bond to indemnify Apollo's rights. In support of its Motion, Apollo relies on the contemporaneously filed Certification of Arnab Sen (the "Sen Certification" or "Sen Cert."), its Chief Financial Officer and Executive Vice President, and respectfully represents as follows:

## INTRODUCTION

1.     The filing of an involuntary petition for improper purposes inflicts serious financial and business harms on the innocent alleged debtor. For this reason, bankruptcy courts – including this Court – scrutinize contested involuntary petitions closely and are vigilant in dismissing involuntary petitions that are filed in bad faith. The Petition filed here is a paradigmatic example of the bad faith petition. As will be demonstrated below, each of these purported and strongly disputed claims were initiated by, or are connected to, three of the Petitioners - Colgan, Morales and Nudo – who were each part-owners of Armanti Financial Services, LLC ("Armanti"), which was acquired by Apollo in July 2006, and most of the claims are part of ongoing litigation in New Jersey State Court. In fact, these Petitioners, and other

Petitioning Creditors under their control and direction, filed this Petition as an acknowledged strong arm litigation tactic to force a settlement of that pending litigation and related disputes. There is no credible basis for the Petitioning Creditors to believe that the conditions that warrant the filing of an involuntary petition are present here.  Tellingly, less than 48 hours after filing this Petition, one of the Petitioning Creditors, Colgan, reached out encouraging Apollo to settle given the filing of the Petition, indicating that he was only "fairly confident" the petition would "stick," but also acknowledging that "the outcome [of the Involuntary Petition] will be devastating" for Apollo.  The Petitioning Creditors should not be permitted to abuse the involuntary petition process for their own litigation advantage, and their Petition should be dismissed outright.  In addition, the Petitioning Creditors should be held accountable for the costs and severe damage this frivolous Petition has caused, and continues to cause to, Apollo's business and reputation.

2.      The law is clear: to defeat a motion to dismiss, the Petitioning Creditors have the burden of meeting the statutory requirements for the commencement of an involuntary bankruptcy proceeding under section 303 of the Bankruptcy Code.  In this case, it also is clear that they have utterly failed to satisfy that burden.  From the face of the Petition itself and the Sen Certification, it is beyond dispute that the Petitioning Creditors have not shown – as they must – that their claims are not subject to a "bona fide dispute" *both* as to liability and amount, and that Apollo is generally not paying its debts as they become due.  See Point I, infra.

3.      For example, as explained below in greater detail, the claims of Colgan, Morales and Nudo (collectively referred to herein as the "Sellers") are strongly and legitimately disputed by Apollo.  The $2.3 million claimed by these Petitioners relate to the last payment allegedly due in connection with their sale of Armanti to Apollo.  Pursuant to the security purchase agreement ("SPA") entered into in connection with that acquisition, the Sellers were to receive an upfront payment of approximately $16 million – which they did – and future

payments totaling approximately $15 million payable over three years based on an earn-out structure.  Subsequently, Apollo and the Sellers executed an amendment to the SPA under which the earn-out structure was converted into a fixed payment of $11,175,000 payable in three installments.  In or around August 2008, the Sellers agreed to defer the balance due, resulting in a final payment of $2,333,333, due upon the occurrence of certain triggering events, or September 15, 2015, whichever comes first.  To date, all but this last payment has been made, and no triggering event causing the last payment to become due has occurred.  There is no dispute that Apollo already has paid the Sellers more than $24 million for their old business.

4.     Critically, the Sellers know their claims are disputed and the reasons for the dispute.  In addition to the final payment not yet being due under the terms of the contract, Apollo disputes continuing liability for the payment of the remaining $2.3 million for the reasons set forth in documents filed by Apollo in ongoing New Jersey State Court Litigation with the Sellers and in a letter sent by Apollo's counsel in that action more than three weeks prior to the Sellers' filing of this Petition.  In fact, in that letter, the Sellers were advised that based on Apollo's ongoing investigation of the Sellers' conduct during their employment with Apollo after the acquisition, it appears that the Sellers breached their fiduciary duties to Apollo, breached their employment agreements with Apollo, wrongly usurped Apollo's corporate opportunities and inappropriately worked to start a rival business.  The Sellers also were put on notice that Apollo would be pursuing claims against the Sellers for this unlawful conduct and would be seeking damages well in excess of the remaining $2.3 million.  Thus, the Sellers' claim that the final payment of $2,333,333 is an overdue debt and is not in dispute is more than disingenuous, it is outright false.

5.     Similarly, the claims alleged by Med-Link (which is owned and controlled by Colgan) and Petitioners 2 Broad Street Associates and 71 Washington Street Associates (part-

owned by the Sellers) are heavily disputed by Apollo.  Through the acquisition of Armanti,
Apollo acquired a perpetual license to use certain hospital software owned and provided by Med-
Link without a continuing license-fee obligation.  The Med-Link software was essential to the
conduct of Apollo's hospital operations, and the acquisition was designed in part to enable
Apollo to continue to utilize the software, consistent with Armanti's operations prior to the
acquisition.   In December 2010, when Med-Link and Colgan threatened to interfere with
Apollo's use of this software, Apollo filed an action in New Jersey State Court against Med-Link
and Colgan seeking injunctive and declaratory relief and compensatory damages relating to Med-
Link's and Colgan's breach of the licensing agreement.  Apollo obtained initial injunctive relief
from the New Jersey State Court requiring Med-Link to continue to provide Apollo with access
to its software.  Moreover, this complex, multi-million dollar pending commercial lawsuit has
now expanded to include the disputes over the $2.3 million claim being asserted here by the
Sellers under the SPA, as well as the rental payments being sought by Petitioners 2 Broad Street
Associates and 71 Washington Street Associates.

6.      Significantly, from a very common-sense perspective, Sellers have
acknowledged that their claims are legitimately disputed.  Just a few days before filing this
Petition, Med-Link and Colgan filed a motion in the New Jersey State Court admitting that they
have been engaged in settlement negotiations with Apollo concerning the disputed claims
asserted here by these Petitioners.  Accordingly, given the detail provided to these Petitioning
Creditors about the reasons why Apollo disputes their claims and the notice they have received
of those disputes (which in addition to the filings noted above includes several pieces of
correspondence sent weeks before the filing of the Petition), there is no credible basis for them to
believe, much less assert, that their claims are not in bona fide dispute. Because these asserted

claims and, as detailed below, the asserted claims of the remaining Petitioning Creditors, are in bona fide dispute, the Petition must be dismissed.

7.       Further, the Petitioning Creditors have blatantly disregarded their obligation to undertake even the most basic and readily accessible measures to accurately determine whether Apollo was truly in financial jeopardy and generally paying its debts as they became due.  From the face of the documents filed in the connection with the Petition, it is clear the Petitioning Creditors failed to perform any due diligence prior to filing the Petition, declining to perform credit checks, make inquiries as to billing cycles or demand payment of their debts.  Had they done so, they easily would have discovered that Apollo's financial health is undeniably sound, it has $6 million in cash and a credit line of $5.75 million and, at any given point in time, it processes payments to hundreds of creditors in the ordinary course.  This Court should draw the negative inference from that selective omission and, due to Petitioning Creditors' the failure to substantiate that Apollo was not generally paying its debts as they become due, dismiss the Petition for that reason as well.

8.       Moreover, based on facts here – ongoing pre-filing litigation over clearly disputed claims and the Petitioning Creditors' indisputable acknowledgement that the Petition was filed to exact a settlement of those disputed claims, as well as to destroy Apollo's business and reputation – the conclusion that this Petition was filed in bad faith and for improper purposes is inescapable.  As such, in accordance with general bankruptcy considerations and pursuant to section 303(i) of the Bankruptcy Code, this Court should award Apollo the costs and reasonable attorneys fees it has incurred in defense of this action, and compensatory and punitive damages.  See Point II, infra.

9.       Finally, given the harm which Apollo has already suffered and continues to suffer as a result of the frivolous and bad faith Petition, this Court should require Petitioning

Creditors to post a bond to indemnify and otherwise protect the interests of Apollo pending

disposition of this action pursuant to section 303(e) of the Bankruptcy Code.  See Point III, infra.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (C).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ARGUMENT

11.    As this Court has noted, "[t]he filing of an involuntary petition by a

creditor must be carefully scrutinized by the Court because such an action is extreme in nature

and carries with it serious consequences to alleged debtor, examples of which include loss of

credit standing, interference with general business affairs and public embarrassment."  In re

Landmark Distribs., Inc., 189 B.R. 290, 306 (Bankr. D.N.J. 1995) (quoting In re McDonald

Trucking Co., 76 B.R. 513, 516 (Bankr. W.D. Pa. 1987)).  The Bankruptcy Code was created by

Congress to act "as a shield for debtors, [rather than] a sword for creditors" (In re R.N. Salem

Corp., 29 B.R. 424, 429 (S.D. Ohio 1983)), and even the good-faith filing of an involuntary

petition creates onerous circumstances for an alleged debtor.  Schmid v. Yorke (In re Reid), 773

F.2d 945, 946 (7th Cir. 1985) (the filing of an involuntary petition is "an extreme remedy with

serious consequences to the alleged debtor").

12.    Where, as here, the Petition filed does not and cannot meet the statutory

requirement for commencing an involuntary bankruptcy case under section 303 of the

Bankruptcy Code, the Petition must be dismissed.  As demonstrated below, this Petition was not

filed to promote the interests of Apollo's creditors generally; to the contrary, the Petition was

filed as a litigation tactic designed to induce a favorable settlement of the Petitioning Creditors'

*disputed* claims, in conscious disregard of Apollo's business affairs and indeed, jeopardizing Apollo's other creditors – the classic example of a bad faith filing. Accordingly, not only should the Petition be dismissed, but Apollo should be awarded compensatory and punitive damages for the Petitioning Creditors' wanton disregard of the legal requirements for filing a bankruptcy petition and their intentional tactics designed to destroy Apollo's business and gain an unfair advantage over both Apollo and its other creditors.

**POINT I**

**THIS COURT SHOULD DISMISS THE PETITION PURSUANT TO 11 U.S.C. § 303**

13. Rule 1011 of the Federal Rules of Bankruptcy Procedure governs the procedure to be utilized in responding to an involuntary petition. That Rule provides that all defenses and objections to an involuntary petition must be presented in the manner prescribed by Rule 12 of the Federal Rules of Civil Procedure. Fed. R. Bankr. P. 1011(b). Rule 12 of the Federal Rules of Civil Procedure allows certain defenses to be asserted in the form of a pre-answer motion. Fed. R. Civ. P. 12(b). Apollo seeks the dismissal of the Involuntary Petition under Rule 12(b)(6) for failure to state a claim upon which relief can be granted because *none* of the Petitioning Creditors are eligible to file this Petition under section 303 of the Bankruptcy Code.

14. Section 303(b) of the United States Bankruptcy Code provides in relevant part: "[a]n involuntary case against a person is commenced by the filing within the bankruptcy court of a petition under chapter 7 . . . by three or more entities, each of which is [] a holder of a claim against such person that is *not contingent as to liability or the subject of a bona fide dispute as to liability or amount . . . .*" 11 U.S.C. § 303(b)(1) (emphasis added). Further, the commencement of an involuntary bankruptcy requires a showing that the alleged "debtor is

generally not paying [its undisputed] debts as [they] become due." 11 U.S.C. § 303(h)(1).  The

petitioning creditors bear the burden of demonstrating compliance with these requirements.

Subway Equip. Leas. Corp. (In re Sims), 994 F.2d 210, 221 (5th Cir. 1993) (citing In re Rimell,

946 F.2d 1363, 1365 (8th Cir. 1991)); see also In re A & J Quality Diamonds, Inc., 377 B.R. 460,

463 (Bankr. S.D.N.Y. 2007).

> 15.    Here, the Petitioning Creditors have failed to meet their burden and

demonstrate that the debts at issue are not in dispute as to liability or amount and that Apollo is

generally not paying its debts as they become due.  Accordingly, the Court should dismiss the

Petition and this case.

**A.    There Is A Bona Fide Dispute As To Liability Or Amount With Respect To Each Of The Purported Claims Asserted By The Petitioning Creditors**

> 16.    The law is clear that if there is a bona fide dispute as to liability or amount

of the claim asserted by the petitioning creditor, the creditor is not eligible to file the involuntary

petition and it must be dismissed.  In re Skyworks Ventures, Inc., 431 B.R. 573, 577 (Bankr.

D.N.J. 2010) (dismissing bad faith involuntary bankruptcy petition and awarding costs, attorneys

fees and punitive damages); In re Silverman, 230 B.R. 46, 54 (Bankr. D.N.J. 1998) (same).

Although Congress has not defined "bona fide dispute," the United States Court of Appeals for

the Third Circuit has adopted what is termed the "summary judgment standard," whereby a debt

is subject to a bona fide dispute and the petition must be dismissed if "'there is a genuine issue of

a material fact that bears upon the debtor's liability, or a meritorious contention as to the

application of law to undisputed facts' . . . [or s]tated another way, a bona fide dispute exists . . .

if substantial factual or legal questions exist regarding the putative debtor's liability to the

claimant."  In re Tama Mfg. Co., 436 B.R. 763, 768 (Bankr. E.D. Pa. 2010) (quoting B.D.W.

Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc., 865 F.2d 65, 66-67 (3d Cir. 1989)); see also In re Skyworks Ventures, 431 B.R. at 577.

17.    Subsequent to the Third Circuit's decision in B.D.W. Associates, Congress amended section 303(b)(1) to add the language "as to liability or amount" after "subject of a bona fide dispute."   H.R. Rep. No. 109-31, at 149 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 207.  As a result of that amendment, "'any dispute regarding the amount that arises from the same transaction and is directly related to the underlying claim should render the claim subject to a bona fide dispute.'"  In re Regional Anesthesia Assocs. PC, 360 B.R. 466, 470 (Bankr. W.D. Pa. 2007) (emphasis added) (quoting In re Euro-Am. Lodging Corp., 357 B.R. 700, 712 n.8 (Bankr. S.D.N.Y. 2007)); see also In re Rosenberg, 414 B.R. 826, 848 (Bankr. S.D. Fla. 2009) (dismissing involuntary petition where dispute existed as to amount of petitioner's claim due under its guaranty).

18.    The existence of a bona fide dispute is evaluated at the time the involuntary petition is filed.  In re Silverman, 230 B.R. at 49.  Further, the full extent of a petitioning creditor's claims need not be disputed for there to exist a bona fide dispute, so long as any portion of the claim is disputed as to liability or amount.  See In re Skyworks Ventures, 431 B.R. at 578.  As explained more fully below, each of the claims of the Petitioning Creditors is subject to a bona fide dispute as to liability, amount or both.

**1.      The Claims Of The Nudo, Morales And Colgan Are Subject To A Bona Fide Dispute**

19.    Petitioning Creditors Nudo, Morales and Colgan each have asserted a claim for a "business debt – breach of contract from sale of Armanti Financial Services, LLC" in

the amount of $777,778, respectively (collectively $2,333,334).[1]  See Petition at 2-3.  These

amounts are not currently due and, in any event, are subject a bona fide dispute – in an already

filed and pending law suit – as these Petitioning Creditors are well aware.

20.    As explained in the Sen Certification, on or about July 31, 2006, Apollo

acquired the stock of Armanti, through an Apollo subsidiary created for the purposes of the

acquisition, Armanti Financial Services, Inc. ("Armanti II").  The purchase price for Armanti

was $16,051,000, pursuant to the SPA.  See Sen Cert. ¶ 5, id., Exhibit ("Ex.") B.

21.    In addition to the purchase price, the Sellers were granted the ability to

earn additional amounts based on certain performance targets.  On or about September 14, 2008,

Apollo and the Sellers entered into the First Amendment to the SPA ("First Amendment"),

replacing the earn out payments with fixed deferment payments totaling $11,175,000, payable in

installments of: $1,766,667 upon execution of the First Amendment (the "1st Installment");

$4,741,667 due on July 31, 2008 (the "2nd Installment"); and $4,666,666 due on July 31, 2009

(the "3rd Installment").  The 1st Installment and 2nd Installment were paid.  See Sen Cert. ¶ 6.

22.    As part of Apollo's ongoing loan negotiations with its lenders, in and

around August, 2008, the Sellers agreed to accept a deferred and bifurcated payment of the 3rd

Installment (the "Deferment Agreement").  See Sen Cert. ¶ 7.  The Deferment Agreement

extended the payment schedule of the 3rd Installment such that $2,333,333, or half of the 3rd

---

[1]    In the New Jersey State Court Action, Petitioners Colgan and Med-Link have asserted the Sellers'
entitlement to $2,333,333.  Critically, in connection with the Petition, although the Sellers claim
entitlement to $777,778 each (collectively, $2,333,334), Colgan represents within the Certification of
William J. Colgan in Support of Involuntary Petition, dated April 26, 2011 [DI 2] ("Colgan Certification"
or "Colgan Cert."), that "Apollo has failed to pay the remaining amount due to Morales of $769,999.89
plus interest" (Colgan Cert. ¶ 28), "Apollo has failed to pay the remaining amount due Nudo of
$769,999.89 plus interest" (id. ¶ 30), and that "Apollo has failed to pay the remaining amount due to
[him] of $769,999.89 plus interest (id. ¶ 32) (collectively, $2,309,999.67).  Petitioning Creditors offer no
explanation of the $23,334.33 difference between the amounts claimed in the Petition and those Colgan
has represented are owing ($2,333,334 versus $2,309,999.67).

Installment, became due no later than March 31, 2010.  The remaining $2,333,333, representing the other half of the 3rd Installment, was converted into an unsecured loan that would be subordinated to Apollo's bank debt (the "Loan").  The Loan accrues 10% interest, compounded annually, and payment is to be made in cash for the principal and accrued interest upon the occurrence of certain triggering events, or September 15, 2015, whichever comes first.[2] See Sen Cert. ¶¶ 7-8.

23.    On August 27, 2009, the Deferment Agreement was discussed and approved by Apollo's board of directors, who praised the Sellers for their willingness to accept the proposed payment structure that reinforced the Sellers' belief in the future success of the Company.  See Sen Cert. ¶ 9; id., Ex. D.

24.    In accordance with the Deferment Agreement, Apollo paid the first half of the 3rd Installment to the Sellers before the due date of March 31, 2010.  The Sellers accepted this payment without protest or reservation.  See Sen Cert. ¶ 7

25.    To date, contrary to the Sellers' contention, no triggering event has occurred to require payment of the remaining $2,333,333 owed pursuant to the Deferment Agreement (the repayment of the Loan).  The Sellers, therefore, do not have a claim against Apollo at this time for the $2,333,333 remaining under the Loan.  See Sen Cert. ¶ 10.[3]

26.    The Sellers have been repeatedly advised of this fact and position of Apollo.  Specifically, the Sellers have been advised of Apollo's dispute that it is required to pay the remaining $2.3 million at this time in documents filed by Apollo in its New Jersey State

---

[2]    Although the Deferment Agreement was not formally executed, the conduct of the parties – including the Sellers' acceptance of the first half of the 3rd Installment and emails confirming acceptance of the deferral – manifested their acceptance of the terms of the Deferment Agreement.

[3]    In addition, this payment is expressly subordinated to Apollo's bank debt.  See Sen Cert. ¶ 8.

Court litigation with Colgan and in a letter sent by Apollo's counsel in that action more than

three weeks prior to the Seller's filing of this involuntary petition.  <u>See</u> Sen Cert. ¶ 11; <u>see also</u>

Sen Cert., Ex. F at 6-7; <u>id</u>., Ex. G.  Apollo also has informed the Sellers that it would not be

making the $2.3 million payment in light of Apollo's ongoing investigation of the Seller's

conduct during their employment which has revealed serious misconduct by the Sellers,

including egregious breaches of their fiduciary duties, efforts to start a rival business, usurpation

of corporate opportunities, and breaches of their employment agreements.[4]  The Sellers also were

put on notice that Apollo would be pursuing claims against the Sellers for such unlawful

conduct, seeking damages well in excess of $2.3 million.  <u>See</u> Sen Cert. ¶ 12; Sen Cert., Exs. G-

H.

      27.     Accordingly, the Sellers' claim that the $2,333,333 is an overdue debt and

is not in dispute is pure fiction.  At the very least, it is beyond peradventure that there are

"substantial legal or factual questions" about whether any amount is currently due to the Sellers,

whether any amount will ever be due to the Sellers, and, if so, what amount will in the future

become due to the Sellers.

      **2.**     <u>**The Claim Of Med-Link Is Subject To A Bona Fide Dispute**</u>

      28.     Petitioning Creditor Med-Link has asserted a claim for a "business debt –

unpaid use of software" in the amount of $348,222.  <u>See</u> Petition at 3.  This claim, like those of

the Seller discussed above, is the also the subject to a bona fide dispute.  In fact, Apollo (at

Colgan's instruction) has already <u>overpaid</u> Med-Link (owned by Colgan) for the use of its

---

[4]   Through the acquisition, each of the Sellers became employees of Apollo and were required to act in
the best interests of Apollo and to faithfully and honestly serve it.  Specifically, Colgan became Apollo's
Executive Vice President in charge of the Hospital Business Unit for Apollo, and executed an Amended
and Restated Employment Agreement dated September 14, 2007.  Morales became Apollo's Vice
President (Operations), and Nudo became Apollo's Vice President (Sales).  They too had executed an
Amended and Restated Employment Agreement.  <u>See</u> Sen Cert. ¶ 12 n.2.

software and Med-Link's claim is also the subject of ongoing litigation in New Jersey State Court.

29.    Through the acquisition of Armanti, Apollo acquired a perpetual license to use certain hospital software owned and provided by Med-Link, free of a continuing license fee – indeed, this was one of the principal reasons for initiating the acquisition.  Med-Link is owned and managed by Colgan.  See Sen Cert. ¶ 14.  After the acquisition, Apollo continued to utilize the Med-Link software pursuant to the terms of a License Agreement, dated July 31, 2006 (the "License Agreement").  See Sen Cert. ¶ 15; id., Ex. I.

30.    In or about the beginning of 2008, during his employment and as an officer of Apollo, Colgan installed software known as Revenue Cycle Managed Services ("RCMS") on Apollo's office computers.  RCMS was an upgraded version of the Med-Link 1.0 software licensed under the License Agreement with a new name.  Colgan did not advise Apollo prior to the installation of RCMS that new software was being installed, nor did Colgan or Med-Link request either a new product agreement or that additional royalties or fees be paid for the use of RCMS.  See Sen Cert. ¶ 15.

31.    On or about August 25, 2010, Colgan resigned from Apollo in his capacity as Executive Vice President.  Colgan agreed to remain as an Apollo employee until December 10, 2010, in order to assist with the completion of certain projects.  Shortly before his departure, Colgan, for the first time, claimed that the RCMS software installed over two years previously was different than the software program licensed by Apollo under the License Agreement.  See Sen Cert. ¶ 16.  On December 6, 2010, Colgan sent an email to Apollo CEO Karen Ferrell, demanding payment for the use of RCMS and threatening to discontinue Apollo's access to this crucial software unless his demands were met.  See id., Ex. J.

32. On December 10, 2010, as a consequence of the irreparable harm that would be caused to Apollo by the shutdown of their essential software – software controlled by Colgan – Apollo filed a Verified Complaint and Order to Show Cause against Colgan and Med-Link in the Superior Court of New Jersey, Chancery Division (the "Superior Court") (docket number C-284-10) (the "New Jersey State Court Litigation").[5]    See Sen Cert. ¶ 17. Contemporaneously, Apollo sought temporary restraints precluding Colgan and Med-Link from taking any action to compromise Apollo's use of the software.   On December 10, 2010, the Superior Court granted Apollo's request for temporary restraints.  See id.

33. Thus, Med-Link's claim against Apollo is already the subject of the complex, multi-million dollar commercial lawsuit that has been pending in New Jersey State Court for more than four months.

34. In addition, not only is Med-Link's and Colgan's awareness of Apollo's position that it disputes the Med-Link claim self-evident from the filings in the New Jersey State Court Litigation, but it is also evident from a letter sent by Apollo's counsel more than six weeks before this involuntary petition was filed.  Specifically, on March 16, 2011, counsel to Apollo wrote to counsel for Med-Link, informing the latter that Apollo was in receipt of Med-Link's

---

[5]   This Court can take, and Apollo hereby requests that the Court take, judicial notice of the filings in the New Jersey State Court Litigation, including those attached as Exhibits to the accompanying Sen Certification, pursuant to Federal Rule of Evidence 201.  Under Federal Rule of Evidence 201, a court may take judicial notice of facts that are not subject to reasonable dispute in that they are either (1) generally known within the territorial jurisdiction of the court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  See Ieradi v. Mylan Labs., Inc., 230 F.3d 594, 600 n.3 (3d Cir. 2000); Pursuit of Athletic Footwear, Inc. v. Save Power Ltd., Civ. A. No. 96-40 MMS, 1996 WL 328596, at *3 n.2 (D. Del. June 7, 2006) (taking judicial notice of state court filings); see also United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (court "'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue'") (citation omitted); St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may consider stipulation, concessions of counsel, transcripts, exhibits and other papers; take judicial notice, whether requested or not of its own records and files, and facts which are of its public records).

invoices for the claim at issue and that Apollo "*disputes* that it owes any of the monies set forth"

therein.  See Sen Cert. ¶ 19; id., Ex. M.[6]

35.    Additionally, Apollo disputes the Med-Link claim because, based on Med-

Link's contractual failure to fulfill its obligations to train Apollo's employees, Apollo has

actually overpaid Med-Link throughout the course of Med-Link's dealings with the Company.

See Sen Cert. ¶ 20.  Pursuant to Section 3.1 of the License Agreement, Med-Link was required to

provide certain support services for a one-year period from the date the License Agreement was

executed (the "Support Period").   Section 3.1 further required that Med-Link train Apollo

employees so that Apollo would not require Med-Link's services and the costs associated

therewith in perpetuity, stating in pertinent part: "prior to the end of the Support Period, Med-

Link shall have trained [Apollo] employees . . . so that such [Apollo] employees then have the

capability to provide the Support Services, without Med-Link's involvement."  See id; Sen Cert.,

Ex. I.

36.    Furthermore, the Company has discovered that the Med-Link invoices

contain items that Apollo never agreed to pay.  Each of the invoices contains a charge for a

"Monthly Support Fee" of $75,000.00 which was never negotiated or consented to by Apollo.

On the contrary, the agreement with Med-Link (and indeed one of the whole points of the

acquisition), clearly stated that Apollo has a perpetual license to use Med-Link's software

without charge.  See Sen Cert. ¶ 21; id., Ex. M.  Upon investigation of amounts the Company has

paid to Med-Link over the past three years, Apollo has determined that it has been wrongly

---

[6]    Apollo is unaware of the basis for the charges that represent the alleged $56,911.15 difference
between the amount Med-Link has claimed in the Petition and the amount it has actually invoiced Apollo
(i.e., $348,222 claimed versus $291,310.85 invoiced), as Med-Link has not previously provided Apollo
with documentation for those amounts.  Apollo has no way of assessing the merit of that difference and,
for that reason, disputes that it owes that amount as well.  See Sen Cert., Ex. M.

invoiced by, and thus overpaid, Med-Link in the amount of approximately $850,000.  Colgan was informed and aware of this dispute prior to the filing of this involuntary petition.  Id., Ex. O.

37.    Most significantly, on April 21, 2011 – just a mere five days before the Petition was filed – Med-Link and Colgan filed a motion in the New Jersey State Court Litigation seeking to enforce a "global settlement agreement" that allegedly resolved "all issues" *in dispute* with Apollo, including the claims asserted in this Petition by Med-Link and the Sellers.  See Sen Cert. ¶ 15; id., Ex. L at 1-7.  Accordingly, based on what can appropriately be called an admission, there is absolutely no credible basis for Med-link and Colgan to assert in the Petition that their claims are not subject to a bona fide dispute.

### 3.    The Claims Of 2 Broad Street Associates, LLC And 71 Washington Street Associates, LLC Are Subject To A Bona Fide Dispute

38.    Petitioning Creditor 2 Broad Street Associates, LLC ("Broad Street Associates") – owned and controlled by Colgan – asserts a claim for "past due rent" in the amount of $250,000.00.  See Petition at 2.  Petitioning Creditor 71 Washington Street Associates, LLC ("Washington Street Associates") – an entity owned by Colgan, Morales and Nudo who act as landlords – asserts a claim for "past due rent" in the amount of $64,986.44.  See Petition at 3.  These claims for past due rent are subject to a bona fide dispute as to both liability and amount.  Indeed, these Petitioners know this fact from the New Jersey State Court Litigation and letters they received from Apollo prior to the filing of the Petition.

39.    Prior to its move to 2 Broad Street – a move brokered by Colgan – Apollo occupied space at 71 Washington Street.  Because the conditions at 71 Washington Street did not suit Apollo's needs, Apollo moved its operations to 2 Broad Street.  Concurrent with the move, Apollo entered into a clear verbal agreement with Colgan that costs would not increase as a result of the move.  See Sen Cert. ¶ 23.

40.     On or about February 23, 2011, in order to increase pressure on Apollo in connection with the New Jersey State Court Litigation, Colgan caused Apollo to be served with eviction complaints with respect to 2 Broad Street for failure to pay rent.    The eviction complaints were filed in the Special Civil Part/Tenancy Dept. of the New Jersey Superior Court against Apollo.  See Sen Cert. ¶ 25; id., Ex. P.

41.     On March 7, 2011, counsel for Apollo sent Broad Street Associates' attorney letter enclosing a check in the amount of $31,379.00, representing "all outstanding rents responsibilities of Apollo" through February 2011.  Attached to the letter was a spreadsheet explaining Apollo's position with respect to the rental payments due to both Broad Street Associates and Washington Street Associates.  See Sen Cert. ¶ 26; id., Ex. Q.

42.     On March 15, 2011, Apollo filed a motion to transfer and consolidate the eviction actions with the New Jersey State Court Litigation, on the basis that the dispute between Apollo and Colgan in the eviction actions involved common questions of law and fact with and arising out of the same series of transactions under dispute in the New Jersey State Court Litigation. On March 17, 2011, Apollo's motion was granted.  See Sen Cert. ¶ 27; id., Ex. R.

43.     During the evening of March 17, 2011 or early morning of March 18, 2011 – the night that Apollo's motion to consolidate actions in the New Jersey State Court Litigation was granted – Apollo's offices at 2 Broad Street were allegedly burglarized.[7]  Notably, none of the valuable electronic devices sitting out in the open (including laptops and iPods) were stolen; rather the perpetrator(s) went directly to Apollo's general counsel's office and stole her laptop.  The perpetrators then ransacked Apollo's CFO's office.  As a result of the burglary, and

---

[7]    Although Colgan has asserted that Petitioner Morales's office at Apollo was "broken into" (Colgan Cert. ¶ 96), an investigation has revealed that Moreles' office was actually opened with a key.

in order to protect its business, Apollo decided to remove certain sensitive documents and property from its offices.  <u>See</u> Sen Cert. ¶ 28.

44.    On Saturday, March 19, 2011, Apollo's general counsel, Decanda Faulk, arrived at Apollo's office with a moving company to begin the relocation of Apollo's property. Employees of Colgan interfered with Apollo's relocation, including by shutting down the elevators to prevent Apollo from removing its possessions.  Colgan contacted Apollo's general counsel, Decanda Faulk, alleged past-due rents which he contended entitled him to prevent Apollo from moving out, but offering to allow the Company to exit if it furnished him with a check for the disputed amounts.  Colgan threatened that "consequences" were forthcoming, stating that "the gloves are off," and that Apollo could expect Colgan to "play dirty."  <u>See</u> Sen Cert. ¶ 29; <u>id.</u>, Ex. T.

45.    On March 21, 2011, as a result of Colgan's attempts to cause harm to Apollo's business operations and threats to its employees, Apollo filed an emergency application to enforce, expand and extend the temporary restraints ordered by the Superior Court in the New Jersey State Court Litigation (the "<u>Emergency Application</u>").  <u>See</u> Sen Cert. ¶ 30; <u>id.</u>, Ex. U.

46.    In short, prior to the Petition being filed, Apollo presented these Petitioning Creditors with a detailed spreadsheet calculating the rent actually due, paid in full the amount acknowledged as having been due and engaged the dispute over the any additional rent due in state court.  As a result, and as with the claims relating to the SPA and the Med-Link license agreement, there can be no disputing that: (a) at the very least, any remaining claim for rent allegedly due is subject to a bona fide dispute and (b) when this Petition was filed, Broad Street Associates and Washington Street Associates knew full well that Apollo disputed their claim for additional rental payments.

4.    **The Claim Of Goldkhin Wholesale Enterprises, Inc. Is Subject To A
Bona Fide Dispute**

47.    Petitioning Creditor Goldkhin Wholesale Enterprises, Inc. ("Goldkhin"),
has asserted a claim against Apollo for "breach of contract – unpaid gasoline charges" in the
amount of $5,520.47.  See Petition at 5.  This claim has been paid by Apollo and, thus, Goldkin
is not a creditor of Apollo.

48.    Goldkhin, which is located at 2 Broad Street, provided gasoline to Apollo
for various aspects of its business.  Pursuant to Apollo and Goldkhin's contractual relationship
and historical course of dealing, Goldkhin invoices Apollo for these gasoline charges on a
monthly basis, and Apollo remits payment for those invoices within 30 days after their receipt.
See Sen Cert. ¶ 39; id., Ex. X.

49.    On April 1, 2011, Goldkhin invoiced Apollo for gasoline charges accrued
in the month of March 2011, in the amount of $5,520.47.  Apollo received that invoice on or
about April 4, 2011.  Apollo remitted payment in full on April 25, 2011 – prior to the filing of
the Petition.  See Sen Cert. ¶ 40; id., Ex. Y.  Thus, the claimed $5,520.47 is not a disputed debt
because it is no debt at all - that amount has been fully paid.

50.    Importantly, Goldkhin knew or should have known that Apollo would be
remitting payment on the claimed amount in the usual 30-day period after receipt of invoice. The
fact that Goldkhin nevertheless sought to imperil Apollo by forcing it into involuntary
bankruptcy for such a modest sum which was not past due and which it had every reason to
expect would be timely paid, is just another example of the bad faith on the part of the
Petitioning Creditors in commencing this case.

**5.      The Claim Of Senorita's Mexican Restaurant, LLC Is Subject To A Bona Fide Dispute**

51.      Petitioning Creditor Senorita's Mexican Restaurant, LLC ("Senorita's") – a restaurant part-owned by Colgan, Morales, and Nudo – asserts a claim against Apollo for "breach of contract – unpaid event costs" in the amount of $5,000.00.  See Petition at 4.  This claim relates to a disputed bill for an Apollo holiday party.

52.      On December 31, 2010, Apollo held its annual holiday party at Senorita's. Charges for the banquet amounted to $3,570.86.  Morales, however, added a 40% gratuity of $1,428.71 and signed on behalf of Apollo.  The previous year's bill contained a reasonable gratuity of just 22.9%.  Apollo has refused to pay the bill for the 2010 holiday party because the Company disputes its liability for the inappropriate, extremely excessive gratuity, deliberately incurred by Morales in favor of his own interests as a part owner of Senorita's and against the interests of the Company.  See Sen Cert. ¶¶ 33-34; id., Ex. V.

**6.      The Claim Of Merrel Mount Is Subject To A Bona Fide Dispute**

53.      Petitioning Creditor Merrel Mount has asserted a claim against Apollo for "reimbursement of consulting expenses" in the amount of $1,600.  See Petition at 4.  Mount is a former employee of Apollo who, after ceasing to be a full-time employee, was retained by the Company as a consultant to address Apollo's client relations.

54.      As an Apollo consultant, Mount reported to Petitioning Creditor Nudo. For his work, Mount was paid by commission.  Mount would send his payment requests to Nudo who, in turn, reported those amounts to Apollo's Accounts Payable department.  In this fashion, Apollo has paid Mount over the course of the past year $98,627.69 in commissions.  In fact, Apollo sent Mount a commission check in the amount of $14,180.12 on April 25, 2011 – the day before this petition was filed.  See Sen Cert. ¶ 35; see also id., Ex. W.

55.     On <u>one</u> occasion, however, Mount submitted a request for expense reimbursement in the total amount of $1,877.23 for various meal and travel-related expenses incurred over the course of the past eight months.  Nudo requested that Mount's expense be approved.  The Company informed Nudo that this one request would not be approved without a more detailed explanation as to the appropriate basis upon which the expenses were incurred.  Apollo, through Sen, has left several messages for Nudo asking him to meet and explain these expenses.  Nudo, who had responsibility for obtaining appropriate support for these expenses from Mount, has never responded to Sen.   Until the appropriate basis of this expense is satisfactorily explained to Apollo by either Nudo or Mount, Apollo disputes its liability in respect of this claim as well as this claim's amount.  <u>See</u> Sen Cert. ¶ 36.

**7.     The Claim Of Prominent Ticket Service Is Subject To A Bona Fide Dispute**

56.     Petitioning Creditor Prominent Ticket Service ("<u>PTS</u>") has asserted a claim against Apollo for "breach of contract – unpaid ticket broker services" in the amount of $3,025.  <u>See</u> Petition at 4.  Prior to the filing of the Petition, Apollo was unaware of any outstanding obligations to PTS.  Petitioning Creditor Nudo is responsible for maintaining the Company's relationship with PTS and he has not submitted to Apollo any invoices or bills showing amounts owing to PTS.

57.     Since the filing of the Petition, Apollo has conducted an internal investigation and confirmed that approximately $1,500 in tickets were purchased through PTS in April.  Apollo has also learned but as of yet, been unable to confirm, that there may be an additional $1,500 owing on account of tickets purchased in March.  Now that Apollo is aware of its obligations to PTS – obligations which Nudo was responsible for but failed to bring to the

Company's attention – all confirmed debts to PTS will be paid.  Apollo will continue to investigate and work to resolve the remaining disputed portions of the claim.  See Sen Cert. ¶ 37.

*          *          *

58.     In sum, all of the claims are the subject of a bona fide dispute as to liability or amount, or both.  Moreover, the claims of the Sellers, Med-Link, Broad Street Associates and Washington Street Associate are part of an ongoing litigation in New Jersey State Court.  Accordingly, the Petitioning Creditors cannot meet their burden under section 303 and their Petition should be dismissed outright.

## B.    Apollo Is Paying Its Debts As Those Debts Become Due

59.     In addition to failing to demonstrate that their claims are not subject to a bona fide dispute as to liability or amount, the Petitioning Creditors also have failed to meet their burden to establish that "*the debtor is generally not paying such debtors' debts as such debts become due. . . .*" 11 U.S.C. § 303(h)(1) (emphasis added).

60.     First, Petitioning Creditors have made a patently deficient showing that Apollo is not generally paying its undisputed debts as they become due.  "[C]ourts expect petitioning creditors to 'carefully examine the risks undertaken in the filing of an involuntary petition.'"  In re Express Car & Truck Rental, Inc., 440 B.R. 422, 432 (Bank. E.D. Pa. 2010) (quoting In re Landmark Distribs., 189 B.R. at 306).  Section 303(h) "requires that a court consider the number of debts the debtor has, the amount of the delinquency, the materiality of the nonpayment, the nature and conduct of the debtor's business, as well as numerous other factors."  Id. at 434 (citing 2 Alan N. Resnik & Henry J. Sommer, Collier on Bankruptcy ¶ 303.31[2] at 303-95 to 303-96 (16th ed. 2010)); see also In re Leek Corp., 52 B.R. 311, 314 (Bankr. M.D. Fla. 1985).  The statute obligates the Petitioning Creditors to undertake due diligence and make a reasonable investigation prior to filing their petition (In re Express Car & Truck Rental, 440 B.R.

-22-

at 434), including implementation of basic methods that creditors typically employ such as a credit check, judgment search or lien search.  In re Skyworks Ventures, 431 B.R. at 578-79.

61.    Here the Petitioning Creditors utterly failed to meet that obligation, proceeding at Apollo's hazard and, for the reasons discussed in Point II infra, their own hazard as well.  They have not alleged that any pre-filing diligence of the type required by Skyworks Ventures was undertaken.  The Petitioning Creditors have not alleged that they performed a credit check or a lien search, made inquiries into Apollo's billing practices or inquired into whether debts were being paid.  Instead, they willfully closed their eyes to what would assuredly have been unhelpful facts and instead filed their Petition with wanton disregard for the impact on Apollo and their own burden in the commencement of this case.  In fact, had they engaged in appropriate and required due diligence, they would have discovered that Apollo has available cash and credit in excess of $11.7 million, which is more than enough liquidity to meet the Company's ongoing needs.

62.    Second, the Petitioning Creditors' allegations concerning Apollo's unpaid debts fall into two categories: (1) those concerning their own claims, which are subject to bona fide disputes and, as such, excluded under the terms of section 303(h) from being considered when deciding whether a proposed debtor is not generally paying its debts; and (2) conclusory allegations asserted in passing and perfunctory manner, falling far short of the requisite pleading standard which, as a result, should be disregarded.

63.    In the Colgan Certification, he asserts that telephone service provided by XO Communications ("XO") to Apollo's Sunrise, Florida office was disconnected.  See Colgan Cert. ¶ 97.  Although Colgan implies that service was interrupted for lack of payment, the service interruption was due to  a billing dispute between XO and Apollo.  Less than a week prior to the disruption, XO had sent an acknowledgment of some discrepancies at their end and issued

-23-

Apollo a credit of approximately $10,500.  XO restored service the same day it was interrupted, without requiring actual payment, based upon a commitment by both parties to resolve the dispute (which they are continuing to resolve).

64.     With similar disregard for the facts, Colgan asserts that PNC Bank has cancelled credit cards issued to Apollo because the Company failed to pay amounts owed to PNC when due.  Colgan Cert. ¶ 97.  This is simply false.  While with the Company, Colgan had been the administrator for its PNC credit card account.  After his departure, PNC Bank sent a letter addressed to Colgan requesting financial information about Apollo as part of the credit card renewal process.  That letter never made its way to Apollo.  Thus, when Nudo attempted to use his card in March 2011, it was declined – but not for a failure to make payment.  After inquiry, Apollo came to learn of the situation, provided the financial information PNC Bank had sought from Colgan, and PNC Bank reactivated the credit cards on or about March 17, 2011 – well before the filing of the Petition.

65.     Finally, Petitioning Creditors allege that Apollo has laid off certain employees over the course of the past several months (Colgan Cert. ¶ 97), as evidence that Apollo is not paying its debts when due.  Layoffs, even if true, are irrelevant to whether Apollo is generally paying its undisputed debts.  In fact, managing labor expenses is a prudent effort by Apollo to sustain its financial success and financial viability.  In any event, Petitioning Creditors fail to even assert that those or other employees were unpaid.

66.     These conclusory and perfunctory assertions, made in sweeping fashion in the final and 97th paragraph of the Colgan Certification constitute the *only* allegations by the Petitioning Creditors of Apollo not paying its debts as they become due to parties *other than* the Petitioning Creditors.  These allegations are facially deficient to establish that Apollo is generally not paying undisputed debts as they become due under the relevant 12(b)(6) standard and should

be disregarded.  Petitioning Creditors, thus, are left with only their own claims and, importantly, dismissal of an involuntary petition is appropriate where the petitioning creditors' debts represent the only alleged obligations which have gone unpaid.  See, e.g., Bankers Trust Co. v. Nordbrock (In re Nordbrock), 52 B.R. 370, 371-72 (D. Neb. 1984) (affirming dismissal of involuntary petition where alleged debt owed to petitioner was the only obligation not being paid in the ordinary course), aff'd, 772 F.2d 397 (8th Cir. 1985); In re Karber, 25 B.R. 9, 14-15 (Bankr. N.D. Tex. 1982) (same).

67.    Third, where a petitioning creditor "can go into state court to satisfy the [alleged] debt, bankruptcy courts should adamantly refuse to enter an order for relief."  In re Petro Fill, Inc., 144 B.R. 26, 30 (Bankr. W.D. Pa. 1992).  Petitioning Creditors certainly could have asserted their claims in a non-bankruptcy forum.  Indeed, many of those claims are *already* being litigated in a non-bankruptcy forum – the New Jersey State Court Litigation.  Further, counsel to the Principals communicated to counsel for Apollo as recently as March 31, 2011 their intent to initiate litigation.  See Sen Cert. ¶ 42; id., Ex. Z.  Given the already pending litigation and the threatened additional litigation, the Petitioning Creditors commencement of this involuntary action can only be seen as an attempt by the Sellers and Med-Link and the other Petitioning Creditors they own and/or control to create leverage against Apollo in the New Jersey State Court Litigation.[8]

68.    Lastly, the Sen Certification makes clear that, contrary to the Petitioning Creditors' unsupported contention, Apollo's financial health is sound.  Apollo is a wholly owned subsidiary of a profitable Indian legal entity, Apollo Health Street Limited, that has highly

---

[8]    If the claims of the Sellers and their affiliates who are Petitioning Creditors are excluded for any reason, the remaining Petitioning Creditors would not hold a sufficient dollar amount in claims to sustain this involuntary Petition, even if their own claims were not also subject to bona fide dispute.  11 U.S.C. § 303(b)(1).

reputable financial investors including One Equity Partners (a private equity unit of JPMorgan Chase). Apollo is an affiliate of a profitable publicly listed international healthcare services company called Apollo Hospitals Enterprises Ltd., based in Chennai, India. The Company is paying its undisputed debts as they become due. Indeed, at any given point in time, payments to hundreds of creditors are processed timely in the ordinary course of Apollo's business and consistent with the expectations of its creditors. <u>See</u> Sen Cert. ¶ 3.

69. Accordingly, the Court should find that the Petitioning Creditors have utterly failed to meet their burden under section 303(h) and dismiss this Petition and case.

## POINT II

### THIS COURT SHOULD IMPOSE SANCTIONS ON PETITIONERS PURSUANT TO 11 U.S.C. § 303(i)

70. Regardless of whether this Court dismisses this case for the Petitioning Creditors' failure to meet the standards of section 303(b) or 303(h), this Court should impose sanctions against the Petitioning Creditors pursuant to section 303(i). Section 303(i) provides for an alleged debtor's recovery of costs incurred defending against petitioning creditors, stating in relevant part:

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this section, the court may grant judgment . . . against the petitioners and in favor of the debtor for . . . (A) costs; or (B) a reasonable attorney's fee.

11 U.S.C. § 303(i)(1). Section 303(i) further provides that a court may grant compensatory and punitive damages:

> against any petitioner that filed the petition in *bad faith*, for . . . (A) any damages proximately caused by such filing; or (B) punitive damages.

11 U.S.C. § 303(i)(2) (emphasis added).  This Court should impose sanctions against Petitioning

Creditors to compensate Apollo for defending against this frivolous and bad faith filing,

including payments covering Apollo's costs, reasonable attorneys fees, compensatory costs and

punitive damages in an amount to be determined by the Court.[9]

**A.     Apollo Is Entitled To Costs And Attorneys' Fees**

71.     Courts in the Third Circuit follow the majority of courts in other circuits,

holding that section 303 carries the presumption that the alleged debtor should be awarded costs

and reasonable attorneys' fees upon the dismissal of an involuntary petition.  See In re Skyworks

Ventures, 431 B.R. at 576.  Indeed, "fees and costs [are] typically awarded upon dismissal" (In

re Silverman, 230 B.R. at 50), and the Petitioning Creditors should have anticipated they would

be awarded against them before filing this frivolous Petition.  See In re Landmark Distribs., 189

B.R. at 306 ("The statute is clear in providing that whether or not an involuntary petition is filed

in bad faith, the court may grant judgment against unsuccessful petitioners for costs and

attorneys fees"); see also In re Express Car & Truck Rental, 440 B.R. at 433 (awarding costs and

attorneys' fees, even though petitioner was willing to withdraw the petition, where petitioner's

"pre-filing investigation was cursory at best and, in any event, wholly inadequate.  In short,

[petitioner] acted unreasonably, perhaps even wantonly, in filing the Involuntary Petitions").

72.     For example, in Landmark Distributors, the debtors sought costs and

attorneys fees accrued in conjunction with an involuntary petition.  189 B.R. at 307-08.  Based

on the totality of the circumstances, the court awarded costs and attorneys fees as damages, in an

amount to be determined, based on its conclusion that the filing of that petition was

"unreasonable and manifested a callous disregard of the adverse impact of the filing on [the

---

[9]     And although Apollo is not obliged to do so here or before the Court rules on the involuntary Petition,
Apollo also reserves all rights under Bankruptcy Rule 9011.

debtor].” Id. at 308.  The court reached that finding, highlighting that those petitioning creditors’ claims were the subject of a “legitimate business dispute,” and that at least  one of the petitioning creditors had failed to make a written demand for payment from the alleged debtor until just days before the filing.  Id.

73.    Here, the Petitioning Creditors’ filing of the Petition was likewise unreasonable and in callous disregard of – if not intentionally designed to create – an adverse impact on Apollo.  All of the claims asserted are subject to bona fide disputes, and nearly all of the Petitioning Creditors were well aware of the disputes at the time they filed the Petition.  With regard to the claims of Mount and PTS, those Petitioning Creditors have not provided documentation or information supporting those claims despite requests to do so, much less issued a demand for payment.  And with respect to Goldkhin’s claim, it was paid in the ordinary course before the Petition was filed – as Goldkhin should have expected based on the historical course of dealing between the parties.  Apollo has incurred significant costs and legal expenses in connection with its defense of this action, for which it is manifestly entitled to recover.

**B.    Apollo Is Entitled To Compensatory And Punitive Damages**

74.    There can be no genuine disagreement that the Petitioning Creditors filed this Petition in bad faith, as demonstrated above.  As a result, Apollo is also entitled to compensatory and punitive damages.  As this Court has stated:

> [I]n determining whether [a] creditor has exercised bad faith in filing an involuntary petition in bankruptcy, inquiry may be made into whether the petition was ill advised or improperly motivated, whether the petitioner took affirmative steps to ensure that the petition as filed was proper, and whether the petitioner made sufficient inquiry into the facts and law surrounding the case to determine the total number of claim holders.

In re Elsub Corp., 66 B.R. 189, 196 (Bankr. D.N.J. 1986). The Court "must consider whether a reasonable person in the position of the petitioning creditor would have initiated the bankruptcy proceeding" and ascertain "the subjective motivations of a petitioning creditor . . . ." Id.

75.    The filing of an involuntary petition for the purpose of collecting a debt indisputably demonstrates bad faith. See Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp., 986 F.2d 709, 716 (4th Cir. 1993) (affirming dismissal of petition brought to collect on a debt); In re Tichy Elec. Co., 332 B.R. 364, 376-77 (Bankr. N.D. Iowa 2005) (same); In re Cannon Exp. Corp., 280 B.R. 450, 455-56 (Bankr. W.D. Ark. 2002) (finding bad faith and dismissing involuntary petition brought in attempt to compel payment on claims); In re Smith, 243 B.R. 169, 197-98 (Bankr. N.D. Ga. 1999) (same); In re Grossinger, 268 B.R. 386, 390 (Bankr. S.D.N.Y. 2001) (holding petitioner commenced involuntary action "as a tactic to extract a settlement of a disputed claim" and thus, in bad faith).

76.    Likewise, this Court has held that filing an involuntary petition as a litigation tactic demonstrates bad faith supporting the imposition of damages under section 303(i)(2). In re Skyworks Ventures, 431 B.R. at 579 (holding petitioner "did not have the interests of other creditors at heart. The petition was not filed in the traditional spirit of collective creditor action; rather, it was an attempt to force [alleged debtor] to settle the disputed claim of [petitioner]"); In re Silverman, 230 B.R. at 53 ("Filing an involuntary petition with the intent to gain a strategic advantage, rather than to protect one's interest relative to other creditors or to prevent dissipation of assets, constitutes an improper purpose").

77.    The Petitioning Creditors' bad faith is manifest, and this Court should award Apollo compensatory and punitive damages. Effectively, all of the Petitioning Creditors are either owned by, under the control of, or acting in concert with Nudo, Morales and Colgan. These individuals are disgruntled former employees and the Sellers of Armanti, who even while

employed with Apollo, sought to directly compete with the Company and have now sought to destroy Apollo's business for the benefit of their competing enterprise.

78.     These individuals have marshaled along the Petitioning Creditors, asserting claims which are all subject to bona fide disputes and in at least one instance was in fact paid prior to the filing of the Petition.  All of the Petitioning Creditors' claims are for discrete business debts which could have been pursued in a non-bankruptcy forum, and, at least with respect to the claims of the Sellers, Med-Link, Broad Street Associates, and Washington Street Associates, are in fact already subject to contested litigation.

79.     The Petitioning Creditors commenced this action with facially deficient allegations, as was assuredly apparent to them.  It was the Petitioning Creditors burden to make the prima facie showing that their claims were not subject to a bona fide dispute and that Apollo was generally not paying its debts as they became due.  Nevertheless, it is clear from the face of the Petition and the Colgan Certification that the Petitioning Creditors' are subject to a bona fide dispute.  Moreover, Petitioning Creditors have not shown, or even alleged, that they undertook the most basic investigation into whether Apollo was generally paying its debts as they became due.  Even accepting the Petitioning Creditors' allegations as true, they do not make out a case for involuntary bankruptcy.

80.     As explained in the Sen Certification, Apollo has already suffered harm to its revenue stream, credit standing, reputation, employee morale, and vendor and client relations as a result of the filing of the Petition.  See Sen Cert. ¶¶ 46-49.  Apollo is at continuing risk of further adverse effects on its lending arrangements, the loss of business, and the departure of employees.  Given the Sellers' efforts to start up another business to act in direct competition with Apollo, to lure away the Company's clients and to recruit the Company's employees, their decision to force Apollo into bankruptcy is not surprising.  It was a calculated move, designed

precisely for the purpose of harming Apollo.  There is no legitimate concern by the Petitioning

Creditors for the well-being of Apollo's other creditors, or for the fair distribution of Apollo's

assets among its creditor body.  Rather, they seek an advantage in pending litigation and business

disputes, with the additional benefit of harming Apollo and enhancing their improper competing

business.  Indeed, they have admitted their ill-motive and their litigation tactic.  Within 48 hours

of the filing of the Petition, Colgan emailed one of Apollo's directors stating as follows: "As I

am sure you are aware, we have filed papers with the bankruptcy court to move AHS into an

involuntary bankruptcy.  I am fairly confident that it will stick and I believe the outcome will be

devastating.  Therefore, I write this email to reach out to you one last time to work out a solution.

Unfortunately, I have no confidence this can be resolved other then [sic] with your direct

involvement." Sen Cert., Ex. A.

81.     The Petitioning Creditors have abused the bankruptcy system, and wasted

the resources of this Court as well as Apollo, to obtain a tactical advantage and to destroy

Apollo's business and reputation.  This Court cannot condone these bad faith efforts; to the

contrary, this Court should impose sanctions on Petitioning Creditors in order to compensate

Apollo for the losses suffered and to deter such wanton and callous conduct, in an amount to be

determined, but currently estimated by Apollo to be no less than $20 million.

## POINT III

### THE COURT SHOULD REQUIRE THE PETITIONING CREDITORS TO POST A BOND PURSUANT TO 11 U.S.C. § 303(e)

82.     The Court should require the Petitioning Creditors to post a bond in the

amount of $20,000,000 in order to protect Apollo's interests against abuse of the involuntary

bankruptcy process.  Section 303(e) provides that, "the court may require the petitioners under

this section to file a bond to indemnify the debtor for such amounts as the court may later allow under subsection (i) of this section."   11 U.S.C. § 303(e).   The Revision Notes and Legislative Reports to the Bankruptcy Reform Act of 1978 make clear that Congress intended subsection (e), in conjunction with subsection (i), to deter misuse and regulate abuse of the involuntary bankruptcy process:

> The bonding requirement will discourage frivolous petitions as well as spiteful petitions based on a desire to embarrass the debtor (who may be a competitor of a petitioning creditor) or to put the debtor out of business without good cause.  An involuntary petition may put a debtor out of business even if it is without foundation and later dismissed.

Miles v. Okun (In re Miles), 430 F.3d 1083, 1090 (9th Cir. 2005) (quoting 11 U.S.C. § 303, Hist. & Stat. Notes, Revision Notes & Legis. Reps., 1978 Acts).   The Senate Committee's language was nearly identical.   See S. Rep. No. 95-989, at 32 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5820.

83.    Courts are empowered to bring a "sobering effect" to involuntary proceedings, especially, where as here, the bona fides of the petitioners' claims are suspect at best.  In re Kidwell, 158 B.R. 203, 218 (Bankr. E.D. Cal. 1993); see also In re Lai Di Zhu, No. 10-19901PM, 2010 WL 4259553, at *2 (Bankr. D. Md. Oct. 21, 2010) (dismissing case due to petitioner's failure to post a surety bond and awarding attorneys fees and punitive damages); Fetner v. Haggerty, 99 F.3d 1180, 1181 (D.C. Cir. 1996) (noting that a court may require a bond as a method "for addressing bad actors"); In re Cinnamon Lake Corp., 48 B.R. 70, 74 (Bankr. M.D. Fla. 1985) (ordering creditors to post bond under section 303(e)).   "In other words, the operative principle [under subsections (e) and (i) is] that one who swats at the hornet had best kill it."  In re Kidwell, 158 B.R. at 213.

84.     As shown above, Apollo has demonstrated that Petitioning Creditors, almost all of whom were under the control or at the direction of the Sellers, have brought this Petition in bad faith, facially failing to meet the statutory requirements and neglecting their responsibilities to perform a reasonable investigation and due diligence of the Company's affairs. Instead, Petitioning Creditors have commenced this case as a litigation tactic aimed at extracting leverage in settlement negotiations.

85.     As set forth in the Sen Certification, Apollo has been harmed by Petitioning Creditors' frivolous commencement of this case, with damage to its institutional reputation, client relationships and credit worthiness.  In just a handful of days since the Petition was filed, for example, the Company has been forced to retain professionals and representatives to advise it on legal strategy, damage control, and public relations, and anticipates further significant sums it will need to expend to extricate itself from the bankruptcy proceedings it did not choose to initiate. Thousands of relationships essential to Apollo's business will be strained as tales of Apollo's "bankruptcy" circulate.  One vendor has already cut off access to $50,000 of credit per month, forcing Apollo to incur the expense of posting a deposit in order to resume its business with the vendor.  Additional disruptions to Apollo's trade relationships could cause significant impact upon the Company's cash flow.  See Sen Cert. ¶¶ 46-47.

86.     Apollo's aggregate amount of trade contracts approximate $25 million dollars in business per year.  If vendors suddenly alter the payment terms upon which Apollo does business, or cancel the customary 30 day window to pay invoices, the adverse effect upon Apollo's liquidity could be profound.  And, even more alarmingly, if Apollo's existing lenders refuse to extend credit or financial accommodations for the benefit of the Company, Apollo could potentially face a significant financial squeeze.  Furthermore, customers might be put-off by the reputational harm suffered by the Company as a result of the involuntary petition, future

business opportunities may be thwarted, and the Company might lose out on opportunities to
attract investments in capital and human resources.  See Sen Cert. ¶ 48.

87.    Currently, $25 million of new business is projected to be generated in
Apollo's Fiscal Year 2012 (April 2011 to March 2012).  If a third or more of new business
contracts are negatively impacted by the reputational damage caused by the involuntary petition,
Apollo's lost business opportunities may exceed $9 million.  If even 10% of the Company's
current annual revenue of approximately $100 million is affected, the involuntary petition could
cause Apollo to lose an additional $10 million dollars.  And if the involuntary petition causes the
Company to lose even $5 million of EBITDA, at an EBITDA multiple of twelve times, that is a
total of $60 million.  See Sen Cert. ¶ 49.

88.    This interference with Apollo's business is particularly egregious given
Apollo's actual financing performance over the last year.  The Company demonstrated strong
quarter on quarter growth in earnings in the last fiscal year ending March 2011, with Q4 earnings
approximately 40% more than that in Q1.  Revenues in Q4 of fiscal year 2011 was the highest
even for the Company in the last two years.

89.    Hence, while it is impossible to quantify the exact amount of damages the
Company will suffer due to the filing of this frivolous Petition, it is abundantly clear that Apollo
will suffer continuing harm until such time as it may be vindicated with its day in Court.
Accordingly, Apollo respectfully requests that the Petitioning Creditors be required to post a
bond in an amount not less than $20,000,000, in order to protect Apollo's interests and secure its
entitlement to damages under section 303(i).

## CONCLUSION

90.    WHEREFORE, for all the foregoing reasons, the Court should (i) dismiss the Petition and this case, (ii) impose sanctions upon the Petitioning Creditors, including payments covering Apollo's costs, reasonable attorneys fees, compensatory costs and punitive damages in an amount to be determined by the Court, and, until that time, require the Petitioning Creditors to post a bond to protect Apollo's interests and indemnify its entitlement to those sanctions; and (iii) grant such other and further relief as the Court deems just and proper.

Dated:    May 2, 2011

RIKER DANZIG SCHERER HYLAND PERRETTI, LLP


/s/ Dennis J. O'Grady _____
Dennis J. O'Grady, Esq. (DO 7430)
Mark E. Hall, Esq. (MH 9261)
One Speedwell Avenue
Morristown, NJ 07962
(Telephone) 973.538.0800
(Facsimile) 973.538.1984
CADWALADER, WICKERSHAM & TAFT LLP
Deryck A. Palmer, Esq. (pro hac pending)
Andrew M. Troop, Esq. (pro hac pending)
Israel Dahan, Esq.
One World Financial Center
New York, NY 10281
(Telephone) 212.504.6000
(Facsimile) 212.504.6666

*Attorneys for Alleged Debtor*
*Apollo Health Street, Inc.*