**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **FILED** | |
| JAMES J. WALDRON, CLERK | |
| May 18, 2011 | |
| U.S. BANKRUPTCY COURT NEWARK, N.J. | |
| BY: /s/Diana Reaves, Deputy | |

IN RE:

Apollo Health Street, Inc.,

                          Debtor.

CHAPTER 7

CASE NO.:  11-22970 (NLW)

**OPINION**

**Before:**     **HON. NOVALYN L. WINFIELD**

**A P P E A R A N C E S :**

Warren J. Martin, Jr., Esq.
Robert M. Schechter, Esq.
Porzio, Bromberg & Newman, PC
100 Southgate Parkway
Morristown, NJ 07960
Attorneys for Petitioning Creditors

Dennis O'Grady, Esq.
Mark E. Hall, Esq.
Riker, Danzig, Scherer, Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962
Co-Counsel for Alleged Debtor

Deryck A. Palmer, Esq.
Andrew M. Troop, Esq.
Israel Dahan, Esq.
Cadwalader, Wickersham & Taft, LLP
One World Financial Center
New York, NY 10281
Co-Counsel for Alleged Debtor

**Procedural History**

This matter was brought before the court by Apollo Health Street, Inc. ("Apollo, Inc.") on a motion to dismiss the involuntary petition filed against it, to impose sanctions against the petitioning creditors and to require the petitioning creditors to post a bond. Apollo, Inc. asserted that (i) it was generally paying its debts as due, and (ii) that the claims of the petitioning creditors were subject to bona fide dispute. Opposition to dismissal of the involuntary petition was filed by the petitioning creditors, and thereafter two days of testimony was had on the issue of whether Apollo, Inc. was generally not paying its debts as they came due. The issue of whether the Petitioning Creditors' claims were subject to bona fide dispute was deferred. After testimony concluded, counsel for Apollo, Inc. moved pursuant to Fed. R. Civ. P. 52(c) for judgment. As set forth below, the court granted that motion because it has determined that as of the petition date, Apollo, Inc. was generally paying its debts as they came due.

The court has jurisdiction to consider the matter before it pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and the court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052 are set forth below.

**Statement of Facts**

The involuntary Chapter 7 petition was filed against Apollo, Inc. on April 26, 2011 by Bloomfield Center Alliance, Inc., Michael C. Nudo, Ariel J. Morales, William J. Colgan, Med-Link Computer Science, LLC, 2 Broad Street Assocs., 71 Washington Street Assoc., LLC, Senorita's Mexican Restaurant, LLC, Merrel Mount, Prominent Ticket Service and Goldkhin Wholesale Enterprises, Inc. ("Petitioning Creditors"). One week later, on May 2, 2011 the Debtor filed its

motion to dismiss the petition and for other relief. The motion to dismiss was accompanied by an application to shorten time for hearing, and on May 2, 2011 the court entered an order which shortened the hearing date to May 10, 2011.

Counsel for Apollo, Inc. and the Petitioning Creditors agreed to proceed first with the testimony and documentary evidence on the issue of whether Apollo, Inc. was generally paying its debts as they came due. Testimony was given by Bernard Katz ("Mr. Katz") and Arnab Sen ("Mr. Sen") for Apollo, Inc. and by Gary Stetz ("Mr. Stetz") for the Petitioning Creditors. Additionally, Boris Khinkis, the principal of Goldkin Wholesale Enterprises, Inc. ("Goldkin") testified as to the amount and timeliness of the obligations owed to Goldkin.

### A.      **Arnab Sen**

Mr. Sen is the Executive Vice President/Chief Financial Officer ("EVP/CFO") for Apollo, Inc. and has held that position since 2008. Mr. Sen is also the CFO for Apollo Health Street Limited ("Apollo, Ltd.") the parent company of Apollo, Inc.[1] He testified that both entities engaged in essentially the same business. That is, they provide revenue cycle management services (i.e., billing, coding, collection) to hospitals and physicians, as well as claims administration and IT services. Apollo, Inc. is the main contracting arm for most of the customers in the United States.

Apollo, Ltd. has 2,600 employees, all based in India. Apollo, Inc. has 750 employees worldwide, 350 of which are in nine offices in the United States.

Apollo, Inc. and Apollo, Ltd. both operate on a fiscal year that ends on March 31st. Mr. Sen testified that in the fiscal year ending in 2011 revenues for Apollo, Inc. amounted to $79 million and that Apollo, Inc. achieved EBITDA of 6.5 million. On cross examination Mr. Sen acknowledged

---

[1] Apollo, Inc. is a wholly owned subsidiary of Apollo, Ltd.

that in that same year interest expenses amounted to $5.7 million. Mr. Sen also stated that for fiscal year ending March 31, 2011 operating expenses amounted to $73 million, of which approximately $42$^2$ million was attributable to employee costs and $30 million was attributable to other operating expenses. Mr. Sen conceded that after payment of interest and other expenses Apollo, Inc. showed a net loss for the fiscal year ending in 2011, that on a net income basis Apollo, Inc. has never been profitable, and that Apollo, Inc.'s retained earnings are in the neighborhood of negative $40 million.

Mr. Sen testified that available cash fluctuates on a monthly basis between $8 million to $6 million at any given time and that on the petition date the cash was about $6.6 million. On May 11, 2011, when he testified, he stated that cash approximated $6 million because the company payroll had just been paid. But, he anticipated that accounts receivable collection would soon return available cash to approximately $8 million. Mr. Sen also stated that Apollo, Inc. has a fully available line of credit for $5.76 million, although the company believes that at present they cannot draw against it because of the involuntary bankruptcy. Mr. Sen stated that in the past two years Apollo, Inc. has not been in breach of any of its lenders' default covenants, and that except for litigation with certain of the petitioning creditors it is not subject to any litigation for nonpayment. Mr. Sen also testified that the company has approximately $20 million in accounts receivable.

According to Mr. Sen, Apollo, Inc. has hundreds of vendors. For the fiscal year ending in 2011 he estimated that vendors numbered 600 and that approximately 4700 invoices were received in the year. He noted that some vendors are recurring and some result from one-time projects. He stated that the vendor terms vary, but that vendor invoices are paid when due except when disputed.

Aged Payable Reports can be extracted from the SAP financial programs used by Apollo,

---

[2]Throughout their testimony, Mr. Sen, Mr. Katz and Mr. Stetz approximated their figures resulting in certain mathematical impercistions.

Inc., and the reports include aged payables for Related Parties as well as Third Party transactions. Aged Payable Reports for January-March 2011 (A-1), April 27, 28 and 29, 2011 (A-2) and solely April 29, 2011 (A-3) were marked into evidence.

Mr. Sen stated that the Aged Payables Reports may not contain all of the vendors. For example, if the vendor has been paid it will not appear on the report. If the vendor received an advance payment it will not appear on the report, and if the vendor invoice is disputed and Apollo, Inc. requires more information the obligation may be reflected as an accrued expense rather than an aged payable. On cross examination Mr. Sen identified accrued expenses as amounting to approximately $700,000.00.

Mr. Sen further testified that invoice processing and check issuance occurs in India, and this may result in a time lag for payment to a vendor. For example, as per B-1 the Goldkin invoice was received by Apollo, Inc. on April 6, 2011, sent to India on the same date, and a check was issued on April 14, 2011, although not mailed to Goldkin until April 25, 2011.[3]

Mr. Sen also testified that Aging Payable Reports include Related Party obligations as well as Third Party obligations and that as of April 29, 2011 (A-2) the aged payables amounted to $4.42 million and of that amount approximately $3.4 million constituted Related Party aged payables, leaving only approximately $1 million was attributable to Third Parties.

Mr. Sen further testified that approximately $587,000 of the $1 million was either subject to dispute, required further explanation or simply not yet due, and he testified in some detail as to the basis for Apollo's treatment of the five claims that comprised all but $78,720 of the $587,000. None of his testimony was rebutted.

---

[3]Mr. Sen could not explain the time difference between the issuance of the check and its mailing. But the court notes that the check was mailed within 30 days of the receipt of the invoice.

On cross examination Mr. Sen also acknowledged that in the fiscal year ending 2011 Apollo, Ltd. infused $6 million into Apollo, Inc. However, he denied that absent the infusion that Apollo, Inc.'s cash position would have been zero. He asserted that also in the same year Apollo, Ltd. was paid $4 million and that the bank loan was prepaid by $2 million.

B.      **Bernard Katz**

Mr. Katz stated that he reached his conclusion that Apollo, Inc. was generally paying its debts as they came due after reviewing, among other documents, the company's bank records, internal financial statements audited financial statements, cash disbursement records and aging reports regarding the company's accounts receivable and accounts payable. Because Apollo, Inc. accounts for approximately 85% of the revenues of Apollo, Ltd., Mr. Katz also examined the Financial Statements for fiscal years ending in 2010 and 2011 prepared by S.R. Batliboi & Assoc., an Ernst & Young affiliate. Mr. Katz stated that he was able to reconcile the Apollo, Inc. financial information with the information included in the audited statements of Apollo, Ltd.

Mr. Katz analyzed Apollo, Inc.'s accounts payable by looking at the Third Party Accounts Payable as well as the Related Party Accounts Payable. He examined then (i) as of March 31, 2010, (ii) as of January 31, 2011, (iii) as of February 28, 2011, (iv) as of March 31, 2011 and (v) as of April 29, 2011.[4] Mr. Katz observed that as to Third Party payables in the aforementioned time periods payments were made approximately 30 days after submission of invoice, which he opined was a very good payment schedule in the healthcare industry. By contrast, the Related Party

---

[4] Mr. Katz testified that Third Party payables amount to approximately $18 million annually, while Related Party payables amount to approximately $12 million. Expressed as a percentage, approximately 60% of the non-employment related operating expenses are owed to Third Party entities and 40% are owed to Related Parties.

payables were averaging 120 to 140 days for payment. However, he pointed out that longer payment terms for related parties is not unusual because different terms are more easily negotiated with related parties than with third parties, and the payment timing is often geared to the cash flow needs of the company or its related entities.

Mr. Katz also examined Third Party accounts payable, aged over a term of 120 days from the date of invoice. He separated the time periods into intervals of 30, 60, 90, 120 and over 120 days, which he characterized as "buckets." As the starting dates for the aging he chose the dates March 31, 2010, January 31, 2011, February 28, 2011, March 31, 2011, and April 29, 2011. Significantly, Mr. Katz pointed out that the buckets were being cleared from one start date to the next. Using his illustration as an example: as of January 31, 2011, in the 0-30 day bucket were payables of $817,945. By February 28, 2011 the 31-60 bucket totaled only $29,740, which reflects that all but $29,740 of the $817,945 January 31, 2011 bucket for 0-30 days were paid. Mr. Katz found that this held true through the subsequent time periods. From this examination of payables aged over a 120 term, Mr. Katz concluded that Apollo, Inc. was not experiencing a build-up of accounts payable. He did however identify the sum of $586,615 in payables as of April 29, 2011 that were more than 120 days from invoice. From his examination and discussions with Mr. Sen, he concluded that they were either subject to dispute, requiring further information, or not yet due.[5] Mr. Katz further stated that although the $586,615 was approximately 60% of the $997,015 accounts payable outstanding as of April 29, 2011, he does not conclude that Apollo, Inc.'s debts are not being paid when due. Mr. Katz pointed out that the other obligations were being met and that $586,615 of third party payables is small in relation to the other obligations that were timely met.

---

[5] In this total, Medlink Computer Science, LLC, a petitioning creditor, was identified as a disputed obligation in the amount of $120,000.00.

He further opined that it would be unrealistic to expect that there wouldn't be some disputes or unresolved claims.

Mr. Katz also analyzed the Apollo, Inc. internally prepared financial statement for the fiscal year ending 2011 from a cash flow point of view, to see whether it was producing positive cash flow sufficient for Apollo, Inc. to meet its bills and debt service. His analysis matched Mr. Sen's conclusion that in the fiscal year ending in 2011, Apollo, Inc. had EBITDA of $6.5 million, which permitted payment of its operating expenses from the cash generated.

Like Mr. Sen, Mr. Katz noted the existence of the bank line of credit for $5.75 million, which has been fully available since 2010. Finally, Mr. Katz testified that since 2007 Apollo, Ltd., the parent, has contributed capital of $96 million to Apollo, Inc. for various purposes. Based on this investment of capital, Mr. Katz infers that Apollo, Ltd. is likely to make future contributions.

### C. Gary Stetz

In preparation for his testimony Mr. Stetz read pleadings, met with Mssrs. Colgan, Nudo and Morales, reviewed the tax returns, audited financial statements, internally generated financial statements and performed some additional research.

Mr. Stetz disagreed with Mr. Katz's assessment that accounts payable as of March 31, 2010 amounted to $8,521,003. Mr. Stetz, relying on the March 31, 2010 tax return for Apollo, Inc. and its subsidiaries (GS-8) determined that accounts payable were actually $16,577,172. Mr. Stetz stated that he relied on the tax return rather than the financial statement because (i) he is not an expert in Indian GAAP, (ii) the tax return was prepared by a reputable accounting firm, and (iii) the tax return is executed under penalty of perjury. The basis for the difference in the accounts payable as reflected in the tax return and the financial statement was not resolved either on cross-

8

examination or re-direct, and the court declines to accord any weight to the testimony.

The thrust of Mr. Stetz's testimony was geared to supporting the Petitioning Creditors' position that for purposes of determining whether Apollo, Inc. was generally not paying its debts as they came due the court must combine the Petitioning Creditors' claims of approximately $3 million with the over 120 days accounts payable acknowledged by Apollo, Inc. Referring to the Involuntary Chapter 7 Petition (P-21) Mr. Stetz identified approximately $2.3 million of the claims as belonging to Mssrs. Colgan, Nudo and Morales. He estimated that the other Petitioning Creditors' claims approximated $700,000. Mr. Stetz reduced the $700,000 in the other Petitioning Creditors' claims to $580,000 to eliminate the claim of Medlink Computer Sciences, LLC ("Medlink") for $120,000, because that claim is captured in Apollo, Inc.'s analysis of claims as of April 29, 2011 that are older than 120 days.[6] As a result, he calculated that Petitioning Creditors' claims, exclusive of Medlink, as approximating $2.9 million. Mr. Stetz further calculated that the combined total of $2.9 million in Petitioning Creditor claims and $997,015 in Third Party Accounts Payable approximated $3.9 million. He then attempted to conclude that $3.6 million of the $3.9 million in accounts payable are older than 120 days from the date of invoice. However, objections by Apollo, Inc. as to lack of foundation precluded him from doing so. Nonetheless, he did opine that the petitioning Creditors held more than 75% of the Third Party accounts payables extant as of April 29, 2011.

## Conclusions of Law

---

[6]Through Mr. Katz's testimony, Apollo, Inc. has shown that total Third Party accounts payable as of April 29, 2011 amounted to $997,015. Further, of that amount, $586,615 were unpaid more than 120 days from the invoice date.

Bankruptcy Code § 303 governs the filing of involuntary bankruptcy petitions and § 303(h) provides in pertinent part that the court shall enter an order for relief if "the debtor is generally not paying such debtor's debt as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount; ..." 11 U.S.C. § 303(h)(1). Although Apollo, Inc. asserts that not only is it paying its debts as they come due, but also that the Petitioning Creditors' claims are subject to bona fide dispute, the testimony and documents presented to the court covered only the issue of whether as of the Petition Date Apollo, Inc. was generally not paying its debts as they came due.

Although Code § 303(h) suggests that a trial will occur if an involuntary petition is contested, Fed. R. Bankr. P. 1011(b) permits defenses and objections to be presented under Fed. R. Civ. P. 12. In fact, courts recognize that involuntary petitions may be adjudicated by trial, a motion to dismiss or a summary judgment motion. *In re Elsa Designs, Ltd.*, 155 B.R. 859, 863 (Bankr. S.D.N.Y. 1993) The matter at hand is something of a hybrid, in that Apollo, Inc. moved under Fed. R. Civ. P. 12(b) to dismiss, but the court also heard two days of testimony. While perhaps not the usual approach, it is certainly in keeping with Code § 102(1) which defines the phrase "after a notice and hearing" as including "such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as appropriate in the circumstances;..." 11 U.S.C. § 102(1). Recognizing that at the Petition Date, Apollo, Inc. was an operating company with many employees that provided services to various entities in the healthcare industry the court held a hearing on shortened notice, but permitted testimony and documents to be placed in evidence. In so doing this court was mindful of the observation that "... the filing of an involuntary petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment." *In re Reid,* 773 F.2d 945, 946 (7th Cir. 1985)(citations omitted).

At the end of testimony, counsel for Apollo, Inc. made a motion pursuant to Fed. R. Civ. P. 52(c), made applicable by Fed. R. Bankr. P. 7052, for judgment on partial findings. Apollo, Inc. contends that the involuntary petition should be dismissed because the evidence shows that the Petitioning Creditors have not met their burden of demonstrating by a preponderance of the evidence that Apollo, Inc. is generally not paying its debts as they come due.

Rule 52(c) of the Federal Rules of Civil Procedure provides, in relevant part:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Over a two day period the court heard testimony from Bernard Katz and Arnab Sen for Apollo, Inc. and Gary Stetz on behalf of the Petitioning Creditors. Exhibits were received in evidence as well. Both sides advised that they did not intend to offer other witnesses or exhibits on the subject of whether Apollo, Inc. is generally not paying its debts as they come due. Accordingly, this court concludes that both sides have been fully heard on the subject and that it may dismiss the involuntary petition because the Petitioning Creditors have not sustained their burden of proof. *N.Y. Susquehanna & W. Ry. Corp. v. Jackson,* 500 F.3d 238, 246 n.6 (3d Cir. 2007)("[T]he Federal Rules of Civil Procedure allow judgment after partial findings against a party that has been fully heard on the relevant issue."); *see also, EBC Inc. v. Clark Bldg. Systems, Inc.*, 618 F.3d 253, 272 (3d Cir. 2010); *Morales Feliciano v. Rullan,* 378 F.3d 42, 59 (1st Cir. 2004).

The Petitioning Creditors argue against the motion on the grounds that (i) the court has not heard testimony on the bona fides of the Petitioning Creditors' claims and (ii) that the testimony of Mr. Katz must be excluded because it is based on facts not in evidence. The court finds neither argument persuasive. First, for purposes of its decision the court will assume (without deciding) that

the claims of the Petitioning Creditors are not disputed by Apollo, Inc. Second, the testimony of Mr. Katz was adequately supported by documents placed in the record by Mr. Katz, Arnab Sen, and by Gary Stetz, the financial expert for the Petitioning Creditors. Finally, as the Petitioning Creditors note, substantial portions of Mr. Katz's testimony are corroborated by the testimony of Arnab Sen.

The Petitioning Creditors have the burden of establishing, by a preponderance of the evidence that Apollo, Inc. is not generally paying its debts as they came due. *Atlas Machine Works, Inc. v. Bethlehem Steel Corp.,* 986 F.2d 709, 715-16 (4th Cir. 1993)(burden is on petitioning creditors to establish that the statutory requirements for commencing an involuntary case have been satisfied); *see also*, *In re Palace Oriental Rugs, Inc.,* 193 B.R. 126, 126 (Bankr. D. Conn. 1996). Once this burden is met, the burden then shifts to the debtor to show that there is a dispute as to material fact. *In re A&J Quality Diamonds, Inc.,* 377 B.R. 460, 463 (Bankr. S.D.N.Y.).

The Bankruptcy Code does not set forth the standard for determining when an entity is not paying its debts as they come due. Rather, the courts have developed a variety of tests. Most courts agree that a finding that the debtor is generally not paying its debts as they come due "requires a more general showing of the debtor's financial condition and debt structure than merely establishing the existence of a few unpaid debts." *In re South Canaan Cellular Investments, LLC,* 2010 WL 3294177 at *14 (Bankr. E.D. Pa 2010) (quoting *In re Vortex Fishing Systems, Inc.*, 277 F.3d 1057, 1072 (9th Cir. 2002)). Accordingly, courts for the most part look to the "totality of the circumstances." Succinctly stated in *In re Fischer,* 202 B.R. 341, 350 (E.D.N.Y. 1996) the inquiry is not subject to hard and fast rules, but rather is a flexible one, "and requires a careful balancing of both the number and amount of unpaid debts, in proportional terms viewed in the light of the alleged debtor's total financial picture." The guideposts for the inquiry should focus on (1) the number of unpaid claims; (2) the amount of such claims; (3) the materiality of the nonpayments; (4)

the debtor's overall conduct of its financial affairs. *Id.*

      **1.**      **Number of Debts and Amount of Delinquency**

A court should consider both the number of creditors and the amount due to determine whether 'the inability to pay or failure to pay is in fact "general."' *In re St. Marie Development Corp. of Montana, Inc.,* 334 B.R. 663, 671 (Bankr. D. Mont. 2005)(quoting *In re Molen Drilling Co., Inc.,* 68 B.R. 840, 842 (Bankr. D. Mont. 1987)).

Here, it appears to the court from the testimony of Mr. Sen and Mr. Katz that Apollo, Inc. is paying almost all of its creditors on a timely basis and has done so for some time. Equally important, Mr. Sen testified credibly as to the reasons a claimant might not be paid timely, and these reasons had nothing to do with inability to pay the obligations. Both witnesses testified that Apollo, Inc. does business with hundreds of vendors and other third parties annually. Mr. Sen testified that in the fiscal year ending 2011, approximately 600 vendors provided services and about 4700 invoices were processed.

Mr. Katz analyzed Third Party accounts payable for the following time periods: 1) as of 3/31/2010, 2) as of 1/31/2011, 3) as of 2/28/2011, and 4) as of 4/29/2011. His examination demonstrated that on average, in these time periods Apollo, Inc. paid its Third Party vendors within 30 days from the date of invoice. The court notes that payments to vendors on approximately 30 day terms is demonstrated not only for the end of the prior fiscal year, but also for all of the months in 2011 preceding the filing of the involuntary petition.

This evidence of timeliness of payment was further buttressed by Mr. Katz's aging of the Third Party accounts payable for the same time periods by 30 time intervals ranging from 0-30 days to over 120 days. This aging showed that in each time period accounts payable were reducing,

rather than accruing.

The court also finds credible the testimony of Mr. Sen and Mr. Katz regarding the $586,615 in Third Party accounts payable that are older than 120 days. The testimony established that these Third Party accounts payable were either disputed, subject to reconciliation of amounts between the vendor and Apollo, Inc., not yet due, or in the case of the $78,267 not tested by Mr. Katz due to the lack of time.

As the testimony indicated and as commonsense would dictate it is not unusual for an operating business to have some older accounts payable due as a result of actual disputes or the process of account reconciliation.

### 2.      **Materiality of Nonpayment and Nature of Apollo, Inc.'s Financial Affairs**

Mr. Sen testified that for the fiscal year ending 2011, Apollo, Inc. had revenues of $79 million and operating expenses of $73 million. Of the $73 million in operating expenses $42 million was attributable to employee costs and $30 million was attributable to other operating costs. Further, the $30 million is comprised of $18 million due to Third Parties and $12 million due to Related Parties. This is a substantial operation, and when the Petitioning Creditors' claims of approximately 3 million and the $586,615 of third party claims Apollo, Inc. acknowledges as due, are measured against the operating expenses that are being paid, they do not indicate an inability for Apollo, Inc. to pay its debts as they come due.

In fact, the evidence establishes that Apollo, Inc. has the ability to pay all of its obligation, including those of the Petitioning Creditors. In addition to what has been demonstrated in the preceding paragraphs, the unrebutted testimony of Mr. Sen and Mr. Katz establishes not only that Apollo, Inc. generates $6-8 million in cash on a monthly basis, but it also has a fully available line

14

of credit for $5.76 million. Moreover, from the capital contributions made by Apollo, Ltd. to date, and the fact that 85% of its revenues are derived from Apollo, Inc., the court infers that further capital contributions would be made. Finally, as Mr. Sen stated, but for some of the Petitioning Creditors there is no litigation against Apollo, Inc. that amounts to collection activity, and Apollo, Inc. is not in breach of any of its bank loan covenants. In other words, from available cash and other resources, Apollo, Inc. has been, and is capable of paying its debts as they come due.

## CONCLUSION

Based on the facts and law set forth above, the Petitioning Creditors have not met their burden of establishing that Apollo, Inc. is generally not paying its debts as they come due. The involuntary Chapter 7 petition is dismissed.


Dated: May 18, 2011                      _____/s/_____
                                         NOVALYN L. WINFIELD
                                         United States Bankruptcy Judge