<u>NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:                                            :        CHAPTER 7

Apollo Health Street, Inc.,                       :

                                                  :        CASE NO.:    11-22970 (NLW)
                              Debtor.             :

                                                  :        **OPINION**
                                                  :

**Before:       HON. NOVALYN L. WINFIELD**

**A P P E A R A N C E S :**

Dennis O'Grady, Esq.
Mark E. Hall, Esq.
Riker, Danzig, Scherer, Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962
Co-Counsel for Alleged Debtor

Deryck A. Palmer, Esq.
Andrew M. Troop, Esq.
Christopher R. Mirick, Esq.
Cadwalader, Wickersham & Taft, LLP
One World Financial Center
New York, NY 10281
Co-Counsel for Alleged Debtor

Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
Cole, Schotz, Meisel, Forman & Leonard
25 Main St.
Hackensack, NJ 07601
Attorneys for Petitioning Creditors

FILED
JAMES J. WALDRON, CLERK
July 5, 2011
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: W Della Reaves, Deputy

Redacted document
FILED
JAMES J. WALDRON
JUL 19 2011
U.S. BANKRUPTCY COURT
NEWARK, N.J.
DEPUTY

Apollo Health Street, Inc. ("Apollo, Inc.") successfully defended against an involuntary

petition. It is presently seeking damages from the petitioning creditors and the fixing of a bond

pending the determination of the amount of the damages. Just prior to the hearing on these matters

the petitioning creditors retained replacement counsel. Apollo, Inc. seeks to disqualify that counsel

pursuant to Rules 1.9 and 1.10 of the New Jersey Rules of Professional Conduct ("RPC"). After

consideration of the motion papers, the supporting exhibits and certifications and legal memoranda,

the court concludes that disqualification is not required.


## JURISDICTION

The court has jurisdiction to consider the matter before it pursuant to 28 U.S.C. § 1334 and

the Standing Order of Reference issued by the United States District Court for the District of New

Jersey on July 23, 1984. The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and

the court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052 are set below.


## STATEMENT OF FACTS

### A.    Background

An involuntary petition was filed against Apollo, Inc. on April 26, 2011 by Bloomfield

Center Alliance, Inc., Michael C. Nudo, Ariel J. Morales, William Colgan, Med-Link Computer

Science, LLC, Prominent Ticket Service, Merrel Mount, Goldkhin Wholesale Enterprises, Inc., 2

Broad Street Associates, LLC, 71 Washington Street Associates, LLC and Senorita's Mexican

Restaurant, LLC ("Petitioning Creditors"). Approximately one week later, Apollo, Inc. filed a

motion to (i) dismiss the petition, (ii) impose sanctions against the Petitioning Creditors, and (iii)

require the posting of a bond. To expedite the hearing, Apollo, Inc. submitted an application for an

2

order shortening the time for the hearing on its motion. By order dated May 2, 2011, the court

granted the request and scheduled a hearing for May 10, 2011.

On the hearing date the Petitioning Creditors and Apollo, Inc. agreed to proceed first with

an evidentiary hearing to determine whether Apollo, Inc. was generally paying its debts as they came

due. At the conclusion of the evidentiary hearing on May 11, 2011, Apollo, Inc. moved for

judgment on partial findings under Fed. R. Civ. P. 52(c). On May 16, 2011, the court issued its oral

decision to dismiss the involuntary petition, followed by its written decision on May 18, 2011. The

order dismissing the involuntary petition was entered on May 19, 2011.

Thereafter, the hearing on the balance of Apollo's motion (specifically, its request for a bond

and to impose sanctions) was rescheduled. Before further hearings could commence, the Petitioning

Creditors sought a determination from the court that the dismissal of the involuntary petition

obviated the need and purpose for a bond. After considering the legal memoranda provided by the

parties, the court issued its opinion, dated May 23, 2011 determining that dismissal of the

involuntary petition does not preclude a request for a bond to indemnify Apollo, Inc. in the event

damages are awarded and the Petitioning Creditors cannot satisfy the award. This decision would

have permitted the commencement of the hearing on the bond, but for the fact that the Petitioning

Creditors replaced their counsel with the firm of Cole, Schotz, Meisel, Forman & Leonard, P.A.

("Cole Schotz"). Believing that prior representation of Apollo, Inc. by Cole Schotz presented a

conflict of interest, Apollo, Inc. demanded that Cole Schotz withdraw.

### B.    Disqualification Motion

When Cole Schotz advised Apollo, Inc. that it did not perceive a conflict of interest Apollo,

Inc. filed the instant motion pursuant to RPC 1.9 and 1.10 to disqualify the firm. The asserted

factual basis for disqualification is threefold.  First, Arnab Sen ("Mr. Sen") the Chief Financial Officer and Executive Vice President of Apollo, Inc. certifies that in July 2006 Cole Schotz represented Armanti Financial Services, LLC ("Armanti") when it was acquired by Apollo, Inc.[1] Further, by reason of its acquisition of Armanti Apollo, Inc. is now the former client.  Second, Mr. Sen states that Apollo, Inc. engaged Cole Schotz to represent it in a dispute with St. Anthony Health Center ("St. Anthony's").  As described by Mr. Sen, Apollo, Inc. sought payment for its services and St. Anthony's counterclaimed seeking damages for Apollo, Inc.'s alleged failure to perform its contractual obligations.  Mr. Sen asserts that "In the scope of the St. Anthony's Representation, Cole Schotz obtained far-ranging confidential and proprietary information about Apollo's relationships with St. Anthony's and its other clients, including information regarding Apollo's billing practices, information technology, personnel issues, and customer relations and practices."  (5/25/2011 Certification of Arnab Sen)  Third, Apollo, Inc. claims that the legal services Cole Schotz provided to Armanti prior to its acquisition by Apollo, Inc. resulted in Cole Schotz acquiring confidential information regarding Armanti's operations.  Because Armanti's operations are now Apollo Inc.'s operations it is a former client and as such it is improper for Cole Schotz to represent the Petitioning Creditors, whose interests are in opposition to those of Apollo, Inc.

In response, Cole Schotz filed certifications from Donald A. Ottaunick, Esq. ("Mr. Ottaunick"), Steven R. Klein, Esq. ("Mr. Klein"), Alan Rubin, Esq. ("Mr. Rubin") and William Colgan ("Mr. Colgan") to describe the nature and scope of its representation.

Mr. Ottaunick and Mr. Klein both identified four matters in which Cole Schotz represented either Apollo, Inc. or Armanti.  These matters were described as follows:

---

[1] Messrs. Colgan, Morales and Nudo were the principals of Armanti Financial Services, LLC.

4

### 1)    St. Anthony's Arbitration

Mr. Ottaunick states that in late August 2009 Mr. Colgan retained Cole Schotz to represent Apollo, Inc. and its subsidiary Zavata, Inc. ("Zavata") in a dispute with St. Anthony's.   Mr. Ottaunick states that he was the partner primarily responsible for managing the case, and that the matter was settled in December 2010. Two claims were asserted. Apollo claimed that St. Anthony's breached an agreement under which Apollo, Inc. purchased $6 million of St. Anthony's accounts receivable. It contended that St. Anthony's delivered a portfolio of receivables worth significantly less than called for by the agreement.   St. Anthony's countered that Apollo, Inc.'s subsidiary, Zavata, breached its revenue cycle management services contract. Both sides eventually agreed to submit their dispute to arbitration.  It was at this point that Cole Schotz was retained by Apollo, Inc. The August 28, 2009 retention agreement describes the representation as █████████████████

████████████████████████████████████

Mr. Ottaunick states that the arbitration focused on the Zavata-Apollo, Inc. relationship with St. Anthony's in the period from October 2006 when Zavata first began contact negotiations, and September 2008 when Apollo, Inc. was replaced by a competitor.  Mr. Klein provides a slightly narrower time line.  He states that the arbitration required Cole Schotz "to understand the operational challenges Zavata and Apollo faced at St. Anthony's" from February 2007 until July 31, 2008.  He further explains that

> [w]e became very familiar with the RCM Contract itself and the key
> performance indicators and learned how Apollo (and before that
> Zavata) performed on a monthly basis during their short tenure.  We
> also probed the facts surrounding the Bought AR Agreement.  Hence
> our representation focused on the RCM Contract and the Bought AR
> Agreement and an 'up close and personal' view of the slow
> deterioration of the St. Anthony's and Apollo relationship between
> 2007 and 2008.

(Klein Certification at 3)

Both Mr. Klein and Mr. Ottaunick state that Apollo, Inc.'s financial condition was not at issue in the arbitration. Further, Mr. Klein disputes Mr. Sen's contention that Cole Schotz learned about the general business and billing practices of Apollo, Inc. Rather, he contends that the firm became well versed simply in Apollo, Inc.'s billing and business practices at St. Anthony's. However, both Mr. Klein and Mr. Ottaunick acknowledge receipt of an Excel spreadsheet from Mr. Sen which contained financial information other than the St. Anthony's contract. Both assert that the information was not relevant to the St. Anthony's matter and was not reviewed except to note its irrelevance.

Mr. Colgan's certification is consistent with and buttresses the description of the St. Anthony's arbitration that is provided by Msrs. Ottaunick and Klein. Mr. Colgan indicates that in 2007 St. Anthony's had contracted with Zavata, Inc. ("Zavata") for revenue cycle management services ("RCM Agreement"). Further, when Apollo, Inc. acquired Zavata it assumed the RCM Agreement as well as some other Zavata contracts. Mr. Colgan also states that after it was determined that Zavata had not met its contractual performance metrics, he and other Apollo, Inc. officers met with St. Anthony's board of directors. At that meeting it was agreed that if Apollo, Inc. did not meet certain performance metrics by the end of 2007, Apollo, Inc. would purchase a segment of accounts receivable from St. Anthony's. Mr. Colgan recounts that a variety of circumstances, including a lack of cooperation from St. Anthony's, precluded Apollo, Inc. from meeting the performance standards required, and in December 2007 Apollo, Inc. purchased the St. Anthony's accounts receivable. Despite this St. Anthony's gave notice of its intent to terminate. Mr. Colgan contends that "Apollo's attempts to cure the alleged default were thwarted by St. Anthony's, and Apollo was ultimately terminated and replaced by a competitor at the end of August 2008, and litigation followed." (Colgan Certification at 5)

Mr. Colgan further advises that he was Cole Schotz's main contact at Apollo, Inc. for the St.

6

Anthony's matter.   However, Mr. Colgan states that he did not participate in the settlement

discussions that occurred between Apollo, Inc. and Cole Schotz in or around November 2010.  He

further asserts that

> [a]lthough it is true that Cole Schotz was given information on how
> Apollo managed the St. Anthony's engagement, any information that
> was exchanged regarding Apollo's business affairs on non-St.
> Anthony's matters was limited in scope to some of the other contracts
> Apollo assumed in its 2007 acquisition of Zavata and only generally
> discussed the quality of Apollo's service to its other revenue cycle
> management clients, and all predates St. Anthony's termination of the
> RCM Contract in July 2008.

(*Id.* at 6)

### 2)   Representation of Armanti in Other Litigations

Both Mr. Ottaunick and Mr. Klein advise that Cole Schotz represented Armanti in 1999 in

the case of EE&C Financial Services and Physicians Support v. Armanti Associates LLC, et al., in

which plaintiffs alleged unfair competition and tortious interference with client contracts.

According to Mr. Klein, plaintiffs also sued to enforce certain restrictive covenants against Msrs.

Colgan, Morales and Nudo.  The matter was settled in or around June 2001.

In 2000 Cole Schotz represented Armanti with regard to a fair debt collection practices

dispute that was settled within five months of its retention.  Finally, in 2004 the firm represented

Armanti in Accounts Receivable Management and Data Services Inc. v. Armanti Financial Services,

LLC et al. in the Superior Court of New Jersey.  In this litigation the plaintiffs sought to enjoin the

University of Medicine & Dentistry from contracting with Armanti for revenue cycle management

services.

### 3.   Acquisition of Armanti by Apollo, Inc.

According to Mr. Rubin in the time period between December 2005 and mid 2006 Cole
Schotz represented Armanti and also represented Msrs. Colgan, Morales and Nudo in the sale of
their interest in Armanti to an Apollo, Inc subsidiary known as Armanti Financial Services, Inc.
("Armanti Financial"). He states that the transaction closed on July 31, 2006. He describes the
negotiations as follows:

> The sellers and Armanti LLC were adverse to the buyers. Cole
> Schotz represented the Sellers and Dechert LLP represented the
> buyers. The purchase agreement was heavily negotiated over a
> protracted period of time. Many issues were hotly contested and, at
> times, the negotiations were contentious. In addition to representing
> the Sellers, Cole Schotz also represented other entities the Seller
> owned in connection with ancillary transactions related to the sale of
> their membership interests in Armanti LLC. These included
> negotiating an office lease between Armanti Financial and an affiliate
> of the Seller We also negotiated a licensing agreement with Armanti
> Financial whereby another affiliate of one of the Sellers licensed
> software to be used by the buyers in the operation of the acquired
> business.

(Certification of Alan Rubin at 2)

### 4.    Apollo, Inc.'s Response

Apollo, Inc. responded to the various Cole Schotz certifications by filing a supplemental
certification from Mr. Sen ("Sen Supplemental Certification"). The Sen Supplemental Certification
supplied thirteen exhibits designated by letters A through M. Apollo, Inc. argues that these exhibits
established that Cole Schotz received confidential information that bears on issues that will be the
subject of the hearings under § 303(e) and (i). That is, Apollo, Inc. contends that the Petitioning
Creditors will focus on the business practices, operations and customer service of Apollo, Inc. in
order to defend against allegations of bad faith and to minimize any damages that might be awarded.
For example, in its Reply Brief Apollo, Inc. describes the St. Anthony's litigation as the single most
significant litigation to which it has been a party and represents that fees paid to Cole Schotz for this

representation amounted to ███████ More particularly it points to Exhibit B to Mr. Sen's

Supplemental Certification to show that on December 6, 2010 Cole Schotz invoiced Apollo, Inc. for

November 2010 services in the amount of ████████

Further, in its Reply Brief Apollo, Inc. describes in great detail the contents of a November

2010 Executive Summary attached as Exhibit D to the Sen Supplemental Certification.  In that

summary ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████   ██████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ (Sen Supplemental Certification Ex.

D)  Apollo, Inc. also claims that the November 2010 Executive Summary demonstrates that in

connection with the St. Anthony's matter Cole Schotz  received information about Apollo's

operations in general.  It reaches this conclusion based on ████████████████████

████████████████████████████████████████

████████████████████████. This observation is indeed

contained in Mr. Ottaunick's summary, and Mr. Ottaunick's additional statements provides helpful

context:



(Sen Supplemental Certification Ex. D. at 7-8)(emphasis supplied).

Apollo, Inc.'s Reply Brief further contends that a subsequent memorandum from Mr. Ottaunick dated December 6, 2010 ████████████████████████████ ████████████████████████████████████ The Reply Brief additionally claims that Cole Schotz acknowledged in this memorandum that████████ ████████████████████ The December 6, 2010 memorandum does not appear to substantiate these statements. The memorandum clearly states ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████ As to the focus of discovery and the knowledge gained, Mr. Adonie provided the following description:

████████████████████████████████████

10



(Sen Supplemental Certification Ex. E, at 4) Similarly, the follow-up memorandum attached as

Exhibit F to the Sen Supplemental Certification addresses ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

    Apollo, Inc. also points to the September 23, 2008 Board Presentation ("2008 Presentation")

provided to Cole Schotz to demonstrate that Cole Schotz received confidential information. The

2008 Presentation ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

    Apollo, Inc. further argues that the draft spreadsheet referenced by both Mr. Klein and Mr.

Ottaunick is a confidential Apollo, Inc. document, and is an indicator of the confidential information possessed by Cole Schotz that will influence the Petitioning Creditors' strategy in discovery and litigation. The court notes that this document was produced after the hearing on the disqualification motion and ██████████████████████████████████████████████████

Finally, in its Reply Brief Apollo, Inc. also argues that as a result of its prior representation of Armanti it is inconceivable that Cole Schotz did not become familiar with confidential internal and non-public information about the operation of Armanti, and now Apollo, Inc. by virtue of its acquisition of Armanti.

## DISCUSSION

Motions to disqualify counsel are not favored "as disqualification is a drastic remedy with often far-reaching, sometimes devastating implications." *Essex Chemical Corp. v. Hartford Acc. & Indem Co.*, 993 F. Supp. 241, 246 (D.N.J. 1998); *Carlyle Towers Condominium Ass'n v. Crossland Sav.*, 944 F. Supp. 341, 344-45 (D.N.J. 1996) (courts should hesitate to impose disqualification except when absolutely necessary); *In re A&T Paramus Co., Inc.*, 253 B.R. 606, 613-614 (Bankr. D.N.J. 1999). A determination that disqualification is appropriate can be reached only after the court has made a "painstaking analysis of the facts and precise application of precedent." *Reardon v. Marylayne, Inc.*, 83 N.J. 460, 469 (1980) (quoting *U.S. v. Standard Oil Co.*, 136 F. Supp. 345, 367 (S.D.N.Y. 1955)).

In the instant matter Apollo, Inc. seeks to disqualify Cole Schotz pursuant to RPC 1.9(a) and 1.10.[2] Rule 1.9(a) provides that:

---

[2] Local Civil Rule 103.1 of the United States District Court for the District of New Jersey provides that subject to such modifications as may be required or permitted by Federal statute, regulation, court rule or decision of law, the Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court govern the conduct of attorneys

> A lawyer who has represented a client in a matter shall not thereafter
> represent another client in the same or a substantially related matter
> in which that client's interests are materially adverse to the interests
> of the former client unless the former client gives informed consent
> conformed in writing.

RPC 1.9(a). Rule 1.10 imputes disqualification to any firm with which the disqualified attorney is

associated "unless the prohibition is based on a personal interest of the prohibited lawyer and does

not present a significant risk of materially limiting the representation of the client by the remaining

lawyers of the firm." RPC 1.10. In the present matter, the basis for disqualification of Cole Schotz

does not relate to any "personal interest." Thus, the disqualification of any attorney at the firm

necessarily requires disqualification of the firm.

Fortunately, recent opinions from the New Jersey courts provide this court with guidance on

the application of Rule 1.9(a) to the facts of this case. Of particular assistance is the New Jersey

Supreme Court opinion in *City of Atlantic City v. Trupos*, 201 N.J. 447 (2010). In *Trupos* the law

firm representing individual taxpayers in their real estate tax appeals had previously represented

Atlantic City in certain real estate tax appeals. The issue presented was whether the law firm's

current representation of the individual taxpayers was substantially related to its prior representation

of Atlantic City, and whether the interests of the taxpayers were materially adverse to the interests

of Atlantic City. The Supreme Court held that:

> [F]or purposes of RPC 1.9 matters are deemed to be "substantially
> related" if (1) the lawyer for whom disqualification is sought received
> confidential information from the former client that can be used
> against that client in the subsequent representation of parties adverse
> to the former client, or (2) facts relevant to the prior representation
> are both relevant and material to the subsequent representation.

201 N.J. at 451-52.

The Supreme Court also observed that a determination of whether a matter is the same or

_____

admitted to practice in this district. D.N.J. L. Civ. Rule 103.1(a).

substantially related must be based in fact. *Id.* at 464. Moreover, it reiterated its determination in *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 221-22 (1988) that the party seeking disqualification has the initial burden of demonstrating that it was previously represented by the attorneys that it now seeks to disqualify and that the present litigation is materially adverse to it. *Id.* at 462. Further, if that burden of production is met "the burden shifts to the attorney(s) sought to be disqualified to demonstrate that the matter or matters in which he or they represented the former client are not the same or substantially related to the controversy in which the disqualification motion is brought." *Id.* at 462-63. "That said, the burden of persuasion on all elements under RPC 1.9(a) remains with the moving party..." *Id.* at 463.

Upon applying these standards to the available record, the court found that Atlantic City had failed to demonstrate that the former and current representations were substantially related. Its decision rested on three points on which Atlantic City failed to meet its burden. First, Atlantic City did not point to any confidential communications it had with the law firm that related to the current tax appeals. *Id.* at 469. Second, Atlantic City did not produce any proof that it shared any settlement tactics or strategy regarding the tax appeals with the law firm. *Id.* Third, Atlantic City produced nothing to establish that the law firm's representation on its behalf in 2006-2007 was relevant or material to representation of the individual taxpayers in 2009. *Id.*

A recent application of *Trupos* was made in *Twenty-First Century Rail Corp., et al. v. N.J. Transit Corp., et al.*, 419 N.J. Super 343 (App. Div. 2011). There the Appellate Division of the Superior Court of the State of New Jersey determined that the law firm subject to the disqualification motion had obtained confidential information in the course of its representation of movant, but that disqualification was not warranted because the prior representation was not substantially related to the current representation.

In December 2008 the Plaintiffs Twenty First Century Rail Corp. ("21ˢᵗ Century") and

14

Frontier-Kemper/Shea/BEMO ("FKSB") brought suit against New Jersey Transit ("NJT") and PB Americas, Inc. ("PB") claiming breach of contract, breach of the covenant of implied good faith and fidelity, and unjust enrichment. The subject of the suit involved construction of the N30 Tunnel Civil & Facilities Project ("N30 Project") which is part of the Hudson Bergen Light Rail System. PB retained the law firm of Peckar & Abramson ("P&A") to defend it against the claims asserted by 21st Century & FKSB.  After the litigation had progressed for some time FKSB moved to disqualify P&A because in February 2004 the lead venture partner of FKSB had retained P&A in connection with the N30 Project.  The focus of FKSB's 2004 retention of P&A was whether the lead venture partner could be subject to liability for construction delays associated with the N30 Project.

As in *Trupos*, it was quickly determined that P&A had previously represented a member of FKSB and that the interests of its current client, PB, were materially adverse to the interests of FKSB.  *Id.* at 358. The Appellate Division then turned to the question of whether P&A's prior representation of FKSB was substantially related to its representation of PB in the current case as measure by Rule 1.9(a) and *Trupos*. It focused on whether P&A received confidential information from FKSB that could be used against FKSB in the present litigation, and whether the facts of the prior representation were both relevant and material to the current litigation.  *Id.* at 358-64.

From its review of the record before the trial court, the Appellate Division concluded that P&A had received confidential information from FKSB. *Id.* at 361.  In reaching its determination the court relied upon an advisory opinion of the Supreme Court addressing Rule 1.6 which states in relevant part:

> [T]his Rule expands the scope of protected information to include all
> information relating to the representation, regardless of the source or
> whether the client has requested it be kept confidential or whether
> disclosure of the information would be embarrassing or detrimental
> to the client.

*In re Advisory Opinion No. 544 of N.J. Supreme Court Advisory Comm. On Prof'l Ethics*, 103 N.J.

399, 406, 511 A. 2d 609 (1986).

Thus, the Appellate Division stated unequivocally that "... client information communicated to an attorney from the client, even if otherwise disseminated or already in the public domain, retains the status of confidence." *21st Century Rail*, 419 N.J. Super. at 359

But, the Appellate Division could not conclude from the record that the confidential information received by P&A in the prior representation could be used against FKSB in P&A's defense of PB in the current litigation. *Id.* at 362. It found the certification filed in support of the disqualification motion to be uninformative in that it was vague and conclusory. *Id.* As a result, the Appellate Division could not discern the connection between the two representations, and consistent with *Trupos*, declined to speculate as to what the connection might be.

Likewise, the Appellate Division did not find that the facts of the prior representation were relevant and material to P&A's current representation of PB. It stated:

> We are not oblivious to the obvious: the N30 Project is the same project for both of P&A's representations, the parties are the same, the contracts are the same, and the existence of delays is the same. The mere numerosity of similarities, however, does not engender materiality or relevance. Missing is competent evidence of facts derived in 2004 that retain "a tendency in reason to prove or disprove any fact of consequence to the determination of the [present] action." (citation omitted).

*Id.* at 363. Nor did the court's review of the PB's defenses and counterclaims suggest that anything P&A learned in 2004 was relevant and material to its current representation. *Id.*

A similarly exhaustive review of the facts underlying a disqualification motion was performed by Judge Falk in *H2O Plus, LLC v. Arch Pers. Care Prods., L.P., et al.*, 2010 WL 4869096 (D.N.J. Nov. 23, 2010). In this matter H2O Plus, LLC ("H2O Plus") sought disqualification of Kelly, Drye & Warren, LLP ("KDW") as counsel to Arch Personal Care Products, L.P. and Arch Chemical, Inc. (collectively "Arch") because KDW had previously represented H2O Plus in 2008

in connection with the sale of its stock to a consortium of private equity investment firms. H₂O Plus

claimed that in the course of that representation KDW had access to the company's confidential and

sensitive information.

H₂O Plus manufactures and markets all-natural skin care products and purchased an all-

natural cosmetic preservative from Arch to suppress contaminants, including mold, for a product

branded as SeaPure. At some point H₂O Plus began to receive complaints from customers regarding

mold in the SeaPure product, and thereafter both H₂O Plus and Arch performed testing which

revealed that use of Arch's product alone could not control mold growth. As a result, H₂O Plus was

forced to recall the SeaPure product and it also sought costs from Arch. After receiving a demand

letter from H₂O Plus, Arch retained KDW. KDW's response to the demand letter not only rejected

the demand, but also asserted that the fault was likely that of H₂O Plus because it had previously

experienced mold contamination at the very facility at which Sea Pure was manufactured. The

response also specifically referred to an FDA audit of the facility. Several days after Arch's

response, H₂O Plus advised Arch that KDW had a conflict of interest, because of KDW's prior

representation of H₂O Plus in the sale of its stock.

The focus of the disqualification motion was on "(1) whether FDA documents were received

in the prior representation; (2) whether the information in those documents was confidential; and

(3) whether they could be used against H₂O Plus in the current litigation case." *Id.* at *6.

KDW argued *inter alia*, that it didn't receive any confidential information during its prior

representation of H₂O Plus because they didn't substantially review any FDA confidential materials.

Rather, that was the job of intellectual property counsel. *Id.* at *6. KDW also contended that the

FDA materials were not confidential because they were available from the FDA website and other

sources. *Id.* at *7. KDW further asserted that the only attorney with responsibility for reviewing

FDA related documents was a first year associate and that he was simply responsible for insuring

17

that the materials were properly uploaded to the electronic data room maintained by KDW. *Id* at *6. These contentions were supported by declarations from KDW attorneys.

In response, through declarations and attached exhibits, H₂O Plus demonstrated that KDW was in possession of FDA documents, electronically accessed them, and billed H₂O Plus for review of the documents. *Id*. at *7. Significantly, H₂O Plus submitted an affidavit from a lawyer with Ropes & Gray, the firm that represented the private equity firms in their acquisition of the stock H₂O Plus stock in which he represented that Ropes & Gray directed specific FDA related questions to a KDW attorney regarding certain alleged deficiencies identified by the FDA in H₂O Plus' operations, and that both Ropes & Gray's supplemental diligence requests and KDW's responses contained confidential information. *Id* at *8. To illustrate, H₂O Plus pointed to an email attached to the affidavit which includes a supplemental diligence list that contains requested items under a heading FDA/Regulatory. *Id*. H₂O Plus pointed out that under that heading were questions specifically relating to FDA inspections in 2007, which are the same inspections referenced by KDW in Arch's response to the H₂O Plus demand letter. *Id*. Further H₂O Plus states that the FDA forms in the data room were in unredacted form, whereas any forms produced by the FDA were redacted to remove a company's non-public information. This contention was supported by a declaration from an attorney specializing in FDA matters. *Id.* at *9-25.

Based on this record Judge Falk found that KDW received confidential information and that "the confidential information that KDW received was not limited to generally sensitive and proprietary information, but rather included FDA related information that specifically bears upon KDW's accusations made in Arch's response to H₂O's initial demand letter." *Id.* at *10. Judge Falk also dispensed with KDW's argument that KDW did not rely on this confidential information in their response to the H₂O Plus demand letter. He pointed out that *Trupos* only requires that confidential information be received and that it can be used against a former client. *Id.* at *11, n.

18

9.

Applying the cases just described to the matter at hand, it is readily evident that Cole Schotz previously represented Apollo, Inc. and that its current representation is materially adverse to Apollo, Inc. In fact, the Cole Schotz representation was substantial, encompassed various matters and occurred over a numbers of years. Cole Schotz represented Apollo, Inc. in the arbitration against St. Anthony's Hospital, which recently concluded in December 2010, and also represented Armanti when it was acquired by Apollo, Inc. Cole Schotz additionally defended Armanti in three litigations in the time period 1999 to 2004. Thus, Apollo, Inc. has met its burden of demonstrating that it was previously represented by Cole Schotz, and that by its current defense of the Petitioning Creditors against Apollo, Inc.'s claim for damages, Cole Schotz is representing interest materially adverse to those of Apollo, Inc.

Further, Apollo, Inc. has demonstrated that in the course of its prior representation Cole Schotz received confidential information. For example, Apollo, Inc. has shown through the exhibits attached to the Sen Supplemental Certification that Cole Schotz (i) received confidential information regarding █████████████████████████████████████ (ii) received confidential information contained in an Apollo, Inc. September 23, 2008 Board Presentation, and (iii) received confidential financial information contained in a draft spreadsheet covering the period April 2008 through March 2009.

Here Apollo, Inc. has not met its burden of demonstrating that the confidential information acquired by Cole Schotz in its prior representations is substantially related to the matters that remain to be determined. Those matters are four-fold: (i) whether cause exists under § 303(e) to require the Petitioning Creditors to post a bond, (ii) whether under § 303(i)(2) Apollo, Inc. should recover its fees and costs; (iii) whether under § 303(i)(2) Apollo, Inc. can recover damages proximately caused by the involuntary petition, and (iv) whether under § 303(i)(2) Apollo, Inc. can recover punitive

damages.

The issue of bad faith is germane to all of these matters, including the allowance of attorney fees under § 303(i)(1). *In re Diloreto*, 388 B.R. 637, 648 (Bankr. E.D. Pa. 2008). The bankruptcy courts in the District of New Jersey generally apply a totality of the circumstances test to determine bad faith. *In re Skyworks Ventures, Inc.*, 431 B.R. 573, 577 (Bankr. D.N.J. 2010) (citing *In re Silverman*, 230 B.R. 46, 52 (Bankr. D.N.J. 1997) and *In re Landmark Distirbs., Inc.*, 189 B.R. 290, 309-10 (Bankr. D.N.J. 1995)). *See also, In re Elsub*, 66 B.R. 189, 196 (Bankr. D.N.J. 1986). The totality of circumstances test includes consideration of whether the petition was filed for an improper use or purpose and the subjective and objective motives of the petitioners. *Skyworks*, 431 B.R. at 577. This court is persuaded that this test should be followed in the matter at hand. Thus to some degree, the time period preceding the involuntary petition will necessarily be examined.[1] At minimum, two lines of inquiry are apparent. It will be necessary to determine what impelled the Petitioning Creditors to file the involuntary petition, including what investigation they undertook to determine that Apollo, Inc. was generally not paying its debts as they came due. Second, an assessment of Apollo, Inc.'s financial position and operations at or about the Petition Date will be needed in order to determine what, if any, damages it actually suffered.

Apollo, Inc. argues that in its prior representations Cole Schotz acquired confidential information about its business practices, operations and customer relations that is substantially related to the issues at hand. However, other than that broad conclusion, Apollo, Inc. has not shown a connection between the confidential information reviewed by Cole Schotz and the issues of bad faith, proximately caused damages and punitive damages. It is not enough to show that prior

---

[1] The court is presently not able to determine what prepetition period is appropriate for examination because Apollo, Inc. has not filed any pleadings that set forth its legal theories or the facts that it believes entitle it to recovery under § 303(e) or (i).

counsel, who is now materially adverse, gained knowledge of confidential information. It must be shown by the movant that the confidential information can be used, or that it is material and relevant. Apollo, Inc.'s failure to demonstrate a connection between the confidential information and the remaining issues makes this matter more akin to *Trupos* and *21st Century Rail* than H₂O Plus.

In *H₂O Plus* the factual record revealed that the FDA audits and related materials were not only received and reviewed by KDW in its prior representation of H₂O Plus, but also that these same materials were directly relevant in KDW's efforts to defend its current client against claims made by H₂O Plus. By contrast, in the present matter the connection between the confidential information acquired by Cole Schotz in its prior representations and its utility or relevance to the facts underlying bad faith by the Petitioning Creditors or proof of damages suffered by Apollo, Inc. is not discernible. For example, the prior litigations on which Cole Schotz represented Armanti occurred 7 to 10 years ago and on their face do not appear to have any factual relationship to the present issues. Beyond the mere mention of these litigations Apollo, Inc. does not offer any description of what confidential information was transmitted or what facts or issues are substantially related in the current matter.

Equally, Apollo, Inc. does not even generally identify what confidential information that was available to Cole Schotz in its representation of Armanti and Mssrs. Colgan, Nudo and Morales when Armanti was acquired by Apollo, Inc., can now be used in this case. That transaction occurred in the period 2005-2006 and Apollo, Inc. supports its allegations of a substantial relationship solely with a July 31, 2006 letter from Cole Schotz ("Deal Opinion") which simply opines on the transaction documents that it reviewed. (Sen Supplemental Certification, Ex. K) However, Apollo, Inc. draws no connection between Cole Schotz's review of these documents or any other documents referenced by the Deal Opinion and the subject matter of the current dispute. No Apollo, Inc. officer or employee describes how the operations and financial structure of Armanti in 2006 is germane to

21

the present matter. *Trupos* plainly instructs that a determination of whether a matter is the same or substantially related must be based in fact. 201 N.J. at 464. Like the Appellate Division in *21st Century* this court is unable to detect how anything reviewed by Cole Schotz in 2006 in connection with Armanti's acquisition by Apollo, Inc. "fits the materiality and relevance calculus of *Trupos*." 419 N.J. Super at 364.

Nor is it readily apparent that any confidential information received by Cole Schotz in the St. Anthony's arbitration will be relevant and material. Cole Schotz was retained by Apollo, Inc. in 2009 to represent it regarding a contract that commenced in 2007 and terminated in 2008. The arbitration settled in December 2010. It is certainly evident from the exhibits supplied by Apollo, Inc. that Cole Schotz has detailed knowledge regarding the St. Anthony's contract and the damages sought by both parties. However, the exhibits attached to the Sen Supplemental Certification reveal facts and issues that appear to have been specific to that arbitration matter. From the exhibits supplied by Apollo, Inc. it appears that Karen Ferrell, Arnab Sen and Decanda Faulk (respectively the President, Chief Financial Officer, and General Counsel) were fully informed about the St. Anthony's arbitration and Cole Schotz's services. Yet, not one certification or affidavit from any of these individuals was submitted to identify how the confidential information from the St. Anthony's arbitration might bear on the present matter. Further, it is also plain that Cole Schotz did receive an Apollo, Inc. spreadsheet for the period April 2008 through March 2009, as well as a copy of a presentation to the Apollo, Inc. Board that identified ███████████ But what is not apparent is how this information relates to the bad faith of the Petitioning Creditors and the damages Apollo, Inc. suffered after the Petition Date.

The primary focus of a determination of the Petitioning Creditors bad faith must be on the time period preceding the filing of the involuntary petition and the steps they took to satisfy themselves that Apollo, Inc. was generally not paying its debts as they came due. Apollo, Inc.'s

financial condition and operations in this time is what is significant and it is the burden of Apollo, Inc. to show that the confidential information gained from an earlier time period can be used. A spreadsheet or a board presentation from an earlier period is not inherently relevant or material.

Of course, mere remoteness in time is not a basis for determining that confidential information is not material to a current litigation. *In Millburn Mktg. Assocs., et al. v. Parker Labs., Inc.*, a patent infringement action, plaintiffs sought to disqualify defendant's counsel because 20 years earlier that counsel had represented plaintiffs in the first patent application for the product that plaintiffs claimed that the defendant was infringing. 1994 WL 228531 (D.N.J. May 17, 1994) Defendant claimed that the patent had been subsequently modified and was substantially different from that referenced in the 1970 patent. The District Court was not persuaded by this argument and disqualified counsel stating that "RPC 1.9(a)(1) does not require the moving party to show an actual breach of confidence before disqualification is warranted. Instead, the moving party need show only that the possibility of such a breach by virtue of the similarity between representations." *Id.* at *8. (emphasis supplied). It is this failure to demonstrate the substantial relatedness that causes Apollo, Inc.'s motion to fail.

## CONCLUSION

Based on the facts and analysis set forth above the motion to disqualify Cole Schotz is denied.

Dated: July 5, 2011

_/s/_
NOVALYN L. WINFIELD
United States Bankruptcy Judge

23